IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

NO. 23-10734-A

_____

JO ANN MACRINA

Appellant,

versus

UNITED STATES OF AMERICA

Appellee.

_____

A DIRECT CRIMINAL APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

_____

**APPELLANT JO ANN MACRINA'S OPENING BRIEF**

PAUL S. KISH                      DAVID H. BOUCHARD
Georgia Bar No. 424277            Georgia Bar No. 712859
Kish Law LLC                      Finch McCranie LLP
Suite 2505                        229 Peachtree Street, NE
229 Peachtree Street, NE          Suite 2500
Atlanta, Georgia 30303            Atlanta, Georgia 30303
(404) 207-1338                    (404) 658-9070

Attorneys for Appellant
JO ANN MACRINA

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

JO ANN MACRINA
    Appellant,

           v.                APPEAL NO. 23-10734-A

UNITED STATES OF AMERICA
    Appellee,

_____/

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Rules of the United States Court of Appeals for the Eleventh Circuit, undersigned counsel certifies that, to the best of his present information, knowledge and belief, the following is a full and complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this case and appeal:

1.      Bouchard, David (Counsel for Appellant)

2.      City of Atlanta – Victim

3.      Davis, Jeffrey (Assistant United States Attorney)

4.      Jones, Steven (U.S. District Court Judge ND-GA)

5.      Kish, Paul (Counsel for Appellant)

6.      Kitchens, Nathan (Assistant United States Attorney)

7.      Macrina, Jo Ann (Appellant)

8.      Porter, Jolee (Assistant United States Attorney)

i

9.      Sommerfeld, Lawrence (Counsel for Appellee)

10.     Steinberg, Jill (former Assistant United States Attorney)

11.     Walker, Linda (U.S. Magistrate Judge ND–GA)

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument in this appeal from a trial that resulted in the conviction of the former Commissioner of Atlanta's Department of Watershed Management.  The issues raised on appeal are fact intensive.  Oral argument will assist the Court in understanding and resolving these issues.

## CERTIFICATE OF COMPLIANCE

Pursuant to 11th Cir. R. 32(g)(1), counsel for Appellant hereby certifies that the size and style of type used in this brief is COURIER REGULAR 12 POINT. Undersigned counsel hereby certifies that the word processing system used to prepare this Brief has counted 12,918 words and 1393 lines of monospaced type in this Brief.

Paul S. Kish
Attorney for Appellant

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE
STATEMENT ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................. iii

CERTIFICATE OF COMPLIANCE ...................................... iv

TABLE OF CONTENTS .............................................. v

TABLE OF AUTHORITIES ......................................... viii

STATEMENT OF JURISDICTION ...................................... xi

STATEMENT OF THE ISSUES ........................................ 1

STATEMENT OF THE CASE .......................................... 2

  Course of proceedings ........................................ 2

  Statement of the Facts ....................................... 4
    Atlanta's Water ............................................ 5
    Architectural and Engineering Contracts .................... 6
    Renewal of A&E ............................................. 7
    Second Round of Evaluations ................................ 8
    JP2 Work Under New A&E .................................... 10
    The Middle East Trip ...................................... 11
    Landscaping ............................................... 13
    Interactions with FBI and Consulting Work For PRAD ........ 13
    "Ethics" Evidence ......................................... 16

STANDARD OF REVIEW ............................................ 18

SUMMARY OF THE ARGUMENT ....................................... 18

ARGUMENT AND AUTHORITY ....................................... 19

I.   The District Court Erred by Holding that Rule 106 Only
     Applies to Statements While in Detention and Thus Prohibited
     the Defense from Using Additional Portions of Appellant's
     Recorded Interview That "in Fairness" Should Have Been
     Presented to the Jury. ................................... 19

     A.  The District Court's Ruling Violates the Plain Language of
         Rule 106. ........................................... 20

     B.  The District Court's Ruling Violates Binding Eleventh
         Circuit Precedent. .................................. 22

     C.  Other Circuits Hold That the Rule of Completeness Renders
         Otherwise Inadmissible Evidence Admissible. ......... 23

     D.  Prejudice........................................... 26
         1) What the Jury Heard ............................. 26
         2) What the Jury Did Not Hear ...................... 27
         3) The Government Exploits the Error ............... 28
         4) The Government Cannot Avoid the Prejudice ....... 31

II.  The District Court's Erroneous Decision to Allow Evidence
     of Ethics Rules in a Federal Bribery Trial was Repeatedly
     Exploited by the Prosecution and Therefore Harmed
     Appellant. .............................................. 32

     A.  City of Atlanta Ethics Rules Were Not Relevant to Whether
         Ms. Macrina Violated 18 U.S.C. §666(a)(1)(B). ....... 33

     B.  Even If Ethics Rules Had Some Tangential Relevance, It Was
         Substantially Outweighed by the Danger of Unfair
         Prejudice, Confusing the Issues, Misleading the Jury,
         Undue Delay, Wasting Time, or Needlessly Presenting
         Cumulative Evidence. ................................ 36

     C.  The Court's Error was Prejudicial................... 40

III.  The District Court Erroneously Instructed the Jury......43

  A.  18 U.S.C. §666 Proscribes Bribes, Not Gratuities........44
  1)  Caselaw...............................................44
  2)  Statutory Text........................................46
  3)  Statutory Context.....................................47
  4)  Legislative History...................................49
  5)  Rule of Lenity........................................50

  B.  The Lower Court Erred by Failing to Instruct the Jury that
      Ms. Macrina Was Charged with Accepting Bribes, Not
      Gratuities. ..........................................50
  1)  The Lower Court Refuses to Instruct About Gratuities..50
  2)  Jurors Should Have Been Informed Gratuities Are Not
      Prohibited by §666....................................52
  3)  Government's Arguments Have No Merit..................54

CONCLUSION ..................................................57

CERTIFICATE OF SERVICE ......................................58

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 163, 109 S. Ct. 439, 446, 102 L. Ed. 2d 445 (1988)........................20, 23

<u>Kelly v. United States</u>, 140 S. Ct. 1565, 1566, 206 L. Ed. 2d 882 (2020)................................................33, 34

<u>Percoco v. United States</u>, 215 L. Ed. 2d 305, 143 S. Ct. 1130, 1139 (2023).........................................32, 54

<u>Salinas v. United States</u>, 522 U.S. 52, 58, 118 S. Ct. 469, 474, 139 L. Ed. 2d 352 (1997)...............................44, 46

<u>Sebelius v. Cloer</u>, 569 U.S. 369, 376, 133 S.Ct. 1886, 185 L.Ed.2d 1003 (2013).........................................21

<u>Skilling v. United States</u>, 14 N.Y.U. J. Legis. & Pub. Pol'y 805, 816 (2011)................................................48

<u>Skilling v. United States</u>, 561 U.S. 358, 408-11 (2010) ....33, 50

<u>U.S. v. Bucci</u>, 525 F.3d 116, 133—134 (1st Cir. 2008) .........24

<u>U.S. v. Gravely</u>, 840 F.2d 1156, 1163 (4th Cir. 1988) .........24

<u>U.S. v. LeFevour</u>, 798 F.2d 977, 980—82 (7th Cir. 1986) ........24

<u>U.S. v. Lopez-Medina</u>, 596 F.3d 716, 735—736 (10th Cir. 2010) ..24

<u>United States v. Adams</u>, 772 F. 3d 788 (6th Cir. 2013) ..........40

<u>United States v. Baker</u>, 432 F. 3d 1189, 1202 (11th Cir. 2005) ..4, 22, 23

<u>United States v. Burnette</u>, 65 F. 4th 591, 609 (11th Cir. 2023) ...4

<u>United States v. Coplan</u>, 703 F.3d 46, 84—85 (2d Cir. 2012) ....24

<u>United States v. Fattah</u>, 914 F.3d 112, 154 (3d Cir. 2019) .32, 54

<u>United States v. Fawbush</u>, 634 F. 3d 420 (8th Cir. 2011) ........40

<u>United States v. Fernandez</u>, 722 F.3d 1, 20—27 (1st Cir. 2013) ......................................................passim

<u>United States v. Focia</u>, 869 F.3d 1269, 1283 (11th Cir. 2017) ..52

United States v. Fulmer, 108 F. 3d 1486 (1st Cir. 1997) ........40

United States v. Ham, 998 F. 2d 1247 (4th Cir. 1993) ..........40

United States v. Hamilton, No. 21-11157, 2022 WL 3593974 at *3-*8 (5th Cir. Aug. 23, 2022).....................44, 47, 48, 50

United States v. Hands, 184 F. 3d 132, at 1329 (11th Cir. 1999) 4, 40

United States v. Haymon, No. 20-4438, 2021 WL 4495813, at *1 (4th Cir. Oct. 1, 2021).....................................35

United States v. Jackson, 688 F. App'x 685, 694 (11th Cir. 2017) ........................................................45

United States v. Jenkins, 2014 WL 12676280, at *4 (W.D. Mich. Aug. 20, 2014)..............................................35

United States v. Jennings, 160 F.3d 1006, 1020 (4th Cir. 1998) ...............................................41, 44, 47

United States v. Joel Iverson Gilbert, et. al, No. 2:17-cr-00419-AKK-TMP (N.D. Al. May 25, 2018)......................36

United States v. Jonathan William Wall, Case 1:19-cr-00500-SAG, (D. Md. Apr. 28, 2022).....................................35

United States v. Lopez, 4 F.4th 706, 715 (9th Cir. 2021) ..24, 30

United States v. Lupton, 620 F.3d 790, 800 (7th Cir. 2010) 34, 41

United States v. McNair, 605 F.3d 1152 (11th Cir. 2010) ...45, 51

United States v. Montalvo-Murillo, 495 U.S. 711, 722, 110 S. Ct. 2072, 2080, 109 L. Ed. 2d 720 (1990).........................4

United States v. Pacquette, 557 F. App'x 933, 935-36 (11th Cir. 2014)..............................................21, 22, 23

United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir. 1988)..............................................19, 27

United States v. Portillo, 969 F.3d 144, 176 (5th Cir. 2020) ..24

United States v. Quinn, 359 F.3d 666, 675 (4th Cir. 2004) .....45

United States v. Robison, 505 F.3d 1208, 1223 (11th Cir. 2007) 52

United States v. Ruiz, 59 F.3d 1151, 1154–55 (11th Cir. 1995) .52

United States v. Silver, No. 1:15-cr-00093 (S.D.N.Y. Sept. 14, 2015) .................................................35

United States v. Stewart, 433 F.3d 273, 312 & n.11 (2d Cir. 2006) ..................................................34

United States v. Sutton, 801 F.2d 1346, 1368 (D.C. Cir. 1986) 24, 25

United States v. Takhalov, 827 F.3d 1307, 1320–24 (11th Cir. 2016) ............................................18, 52, 54

United States v. Terry, No. 1:10-cr-390, 2011 WL 2149361, at *4 (N.D. Ohio May 31, 2011) .................................34

United States v. Urciuoli, 613 F.3d 11, 15-16 (1st Cir. 2010) .34

United States v. Walsh, 654 F. App'x 689, 696 (6th Cir. 2016) .35

United States v. Ware, 69 Fed. 4th 830, 845 (11th Cir. 2023) 18, 26

United States v. Washington, 887 F. Supp. 2d 1077, 1106 (D. Mont. 2012) .........................................34, 35

**Statutes**
18 U.S.C. §§666, 1343 & 1346 ............................34, 42
18 U.S.C. §371 ........................................................2
18 U.S.C. §666 ..................................................passim
18 U.S.C. §666(a)(1)(B) ........................................passim
21A Charles Alan Wright et al., Fed. Prac. & Proc. Evid. § 5078 (2d ed.) .............................................25
26 U.S.C. §7206(2) ...............................................2
Christopher B. Mueller & Laird C. Kirkpatrick, Fed. Evid. § 1:43 (4th ed.) ........................................25

**Rules**
Fed. R. Evid. 403 ...............................................32
Federal Rule of Evidence 106 ..............................passim
Rule 4(b) ..............................................................xi
Rule 403 ...........................................................36, 40

## <u>STATEMENT OF JURISDICTION</u>

This Court has jurisdiction to consider this case pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure.  This is a direct appeal from a trial that resulted in a criminal conviction.

<u>**STATEMENT OF THE ISSUES**</u>

I.    Whether the lower court's holding that the "rule of completeness" in Federal Rule of Evidence 106 only applies to statements made by an accused while in detention harmed Appellant by preventing her from using parts of her statement to the FBI which would have clarified, explained, or put in context other parts used by the prosecution in this close case to the point that a new trial is required?

II.   Whether the District Court's ruling allowing the Government to admit substantial irrelevant municipal "ethics" evidence in this federal corruption trial was so prejudicial that Appellant is entitled to a new trial?

III.  Whether the lower court's failure to instruct the jury that 18 U.S.C. §666 prohibits bribes, but not gratuities, deprived the jury of critical legal guidance in a case where a reasonable jury could conclude the evidence showed Ms. Macrina accepted gratuities, not bribes?

## STATEMENT OF THE CASE

### Course of proceedings

From 2011 — 2016, Jo Ann Macrina was the Commissioner of the Department of Watershed Management ("DWM"), the largest Department in the City of Atlanta ("COA") government. From 2016 — 2019, she met with the Government over 20 times in three years to aid in the investigation of COA corruption. The prosecution then did an about-face and indicted Ms. Macrina for conspiracy to commit bribery (18 U.S.C. §371), substantive bribery (18 U.S.C. §666(a)(1)(B)) and failing to report and pay her personal income taxes (26 U.S.C. §7206(2)). (Doc. 1). This last charge was dismissed shortly before trial. (Doc. 106).

The FBI secretly recorded its final meeting with Ms. Macrina in 2019. At trial, the Government moved to admit short pieces totaling 8 minutes from that 105-minute recording. The prosecution argued that the defense could not use the remaining parts unless Ms. Macrina testified. (Doc. 86-12-13; Doc. 99-16-17). Ms. Macrina contended that additional parts of the recording were admissible even if she did not testify, pursuant to Federal Rule of Evidence 106 (the "Rule of Completeness"). (Doc. 97, Doc. 105). The trial court denied this motion, prior to and during trial, holding that Rule 106 only applies to statements made while a person is detained. (Doc. 101-14-17, Doc. 109).

The defense moved to exclude evidence concerning COA ethics

2

rules both before and during the trial.  (Doc. 80, 86, 93).  The District Court denied these motions.  (Doc. 99-4-8).

Ms. Macrina asked that the trial court instruct the jury, consistent with decisions in other circuits, that 18 U.S.C. §666(a)(1)(B) does not prohibit acceptance of goodwill and friendship payments or after-the-fact gratuities.  (Doc. 94-23-25).  The District Court denied this request.  (Doc. 171-1337-1343).

The jury found Ms. Macrina guilty of both the conspiracy and the substantive bribery charge.  (Doc. 127).  The trial court granted her request to supplement the record with the transcript from the entire secretly recorded final meeting with the FBI agents. (Doc. 118, 121, 134, 144). The District Court thereafter imposed a 54-month sentence which Ms. Macrina is serving.  (Doc. 143, 161).

**Statement of the Facts**[1]

Jo Ann Macrina ran DWM, the largest COA department, between 2011 and when she was fired on May 21, 2016. The next day she reached out to the FBI[2] and began an almost 3-year odyssey of helping the FBI and the U.S. Attorney's office investigate COA corruption. In 2019 the Government then changed course and indicted her for accepting supposed bribes from Lohrasb "Jeff" Jafari, the principal in a company called "PRAD," which was part of a Joint Venture ("JV") that had contracts with COA. The Indictment alleged that Ms. Macrina influenced COA's procurement process so that the PRAD JV would be an approved COA contractor and would win lucrative DWM projects. The Indictment further alleged that after Ms. Macrina took such actions Jafari directly or indirectly gave her cash, a ring, a shopping trip, landscaping work at her home, a job at PRAD, and $30,000 for her work at PRAD.

---

[1] Ms. Macrina challenges the lower court's evidentiary rulings and jury instructions. Such issues are generally reviewed under the "harmless error" standard. The Court looks to the entire record when assessing whether an error caused "harm". United States v. Burnette, 65 F. 4th 591, 609 (11th Cir. 2023); United States v. Baker, 432 F. 3d 1189, 1202 (11th Cir. 2005); United States v. Hands, 184 F. 3d 132, at 1329 (11th Cir. 1999). "We determine whether an error had substantial influence on the outcome by weighing the record as a whole." See United States v. Montalvo-Murillo, 495 U.S. 711, 722, 110 S. Ct. 2072, 2080, 109 L. Ed. 2d 720 (1990). Because this Court will "weigh[] the record as a whole" when assessing the harm caused by an error, Ms. Macrina will describe all the facts, and will not merely discuss the evidence in the light most favorable to the verdict.

[2] Ms. Macrina had previously cooperated with and was a publicly named prosecution witness for a public corruption probe in DeKalb County, which is how she already had FBI contact information.

During her meetings with the Government Ms. Macrina discussed the selection process for COA Architectural & Engineering Contract-7383. That contract is at the heart of the Indictment's allegations. The following sections provide context for that contract and the prosecution's allegations that Ms. Macrina favored Jafari and his company during the application for and award of valuable engineering work.

**Atlanta's Water**

The DWM has a budget of over $600 million dollars. Other than the Atlanta airport it is the largest department in the COA government. DWM provides clean drinking water to almost one million residents, and handles the discharge and treatment of wastewater and the directing of surface water. (Doc. 167-314-320).

Atlanta's sole source of clean drinking water is the Chattahoochee River. When Ms. Macrina began working as the Commissioner, Atlanta had a 3-day backup supply of clean water if anything happened to the river. During her 5-year tenure as the Commissioner, Ms. Macrina and her team embarked on an audacious project by which COA bored a tunnel through bedrock and then pumped water almost 5 miles uphill from the river through the tunnel and stored it in the then-abandoned Bellwood Quarry. As a result, Atlanta now has a 30-day supply of backup water. This water supply project used the majority of capital improvement funds spent by DWM. (Doc. 167-317). PRAD was one of the engineering firms working

5

on the water supply project.  Witnesses lauded the tunnel project as a major success.

### Architectural and Engineering Contracts

When COA Departments needed architectural or engineering services, they contracted with approved outside firms under an "A&E" contract.  Only approved COA vendors could provide A&E services to COA Departments under an A&E contract.

Typically, after COA received bids on a request for proposal ("RFP") and completed its evaluation process, COA would select six firms to provide A&E services to the various departments during the term of the contract.  The head of each COA Department had the option to select any of the six A&E firms to perform work.  However, the Department head could not make a unilateral decision.  Each selection required approval of and signatures from other high-ranking members of the relevant Department, ratification from the City Council, and ultimate approval by the Mayor. (Doc. 168-424-426).

COA procurement rules required that a percentage of work be performed by minority or female owned firms.  As a result, larger and more established engineering firms often formed a JV with minority or female owned firms.  One such JV was "JP2".  The minority partner for JP2 was PRAD and its executive Vice-president was Jafari.

6

### Renewal of A&E

The A&E contracts generally lasted five years. The COA Procurement Department oversaw the process for the renewing the A&E. In 2013, Procurement sent out notifications asking that interested companies prepare to bid on the upcoming A&E. (Doc. 167-226-230); Doc. 168-478-479).

Procurement began evaluating the proposals. This evaluation process required participation by at least one or more members of the various COA Departments that would use the services paid for by the contract. The evaluators would read the proposals and later meet in person to try and reach an agreed-upon score in a series of categories for each proponent.

By late 2013, Procurement sent out the RFP for the upcoming A&E, referred to as the "7383". Because this was the City's largest contract, the early correspondence about, the RFP itself and the Chief Deputy of Procurement all anticipated in-person oral interviews of proponents were likely after evaluation of the written proposals. (Doc. 167-234, 240, 294, Doc. 168-475, 482-484, 475).

DWM was the largest user of A&E services. Therefore, Procurement asked that DWM name two individuals to act as evaluators for the 7383 proposals. Ms. Macrina named Frank Stephens and Reginald Wells as evaluators. Ms. Macrina did not seek to influence their scoring and each said the evaluation process was fair. (Doc. 169-788, 857-874).

7

The 7383 evaluators completed their scoring in late 2014. The evaluators did not request oral interviews. (Doc. 169-783). Jafari's JV wound up as the eighth highest, meaning his company would not get further work under the 7383 A&E contract. (Doc. 167-269-270).

### Second Round of Evaluations

Someone in Procurement decided that there should be a second round of evaluations for the 7383, meaning that Jafari's JV would get another chance. Someone at DWM, Parks and Public Works had requested that interviews be conducted during the second round of evaluations, but it was the head of Procurement who decided there should be a second round of evaluations. (Doc. 268-488). Having a second round of evaluations was not unheard of. (Doc. 168-528-530). Years later, while cooperating with the FBI, Ms. Macrina said she decided there should be a second round of evaluations, even though every witness and all documents demonstrated that Procurement was solely in charge of this process.

Around the time of the second evaluations one of the DWM evaluators (Frank Stephens) was about to retire. One reason Stephens retired was because of an uncomfortable conversation with the Deputy Chief of Procurement relating to the 7383 evaluations. Mr. Stephens testified he was not uncomfortable with anything that Ms. Macrina said or did. (Doc. 169-827-828).

The other DWM evaluator from the first round, Reginald Wells,

8

was overwhelmed by work. He was relieved when Ms. Macrina told him to go back to his regular projects and that he would no longer need to be an evaluator. (Doc. 169-865-866, 870).

Ms. Macrina named herself and Deputy DWM Commissioner Jay Ash as replacements for the second round of 7383 evaluations. No rule prohibited Department heads from being an evaluator, it had happened at least once before. (Doc. 168-531-532). After Ms. Macrina and Mr. Ash were named as the DWM participants for the second round, each received the same ethics training provided to other evaluators. (Doc. 167-441-444).

The final score for JP2 increased in relation to other proponents in the second round when Ms. Macrina was an evaluator. (Doc. 167-283, Doc. 168-450-452). No one said that Ms. Macrina influenced the other evaluators to favor JP2 during the second round. One non-evaluator witness recalled that Ms. Macrina and the evaluator from Parks Department were "outspoken." (Doc. 168-449, 468).

The collaborative scoring sheets from the first and second rounds of evaluations included initial and final figures from each person who was evaluating the bidders. These documents demonstrated that Ms. Macrina's individual score both helped and hindered the final score for Jafari's JV. (Doc. 167-302-304; Doc. 168-465-469).

During the oral interviews for the second round of 7383

9

evaluations an engineer named George Ajy participated on behalf of JP2. Ms. Macrina asked that Mr. Ajy be present for the JP2 oral interview, and this was unusual since Ajy by that time was a member of a competing JV. (Doc. 169-685-687, 737-740).

After the oral interviews and collaborative scoring in the second round of evaluations, Jafari's JV (JP2) moved up to second position. (Doc. 168-450-452). As a result, by the latter part of 2015 JP2 was eligible to continue working on new A&E projects along with its ongoing work from the earlier contract.

### JP2 Work Under New A&E

The new 7383 A&E contract went into effect in late 2015. As noted above, Ms. Macrina was fired on May 21, 2016. Prior to her termination, she approved several projects by which JP2 performed work under the new A&E.

One 7383 project Ms. Macrina awarded to JP2 under the 7383 was for the "Peyton Center". Ms. Macrina made a sole source award to JP2, which one witness called "unusual." (Doc. 167-347). But witnesses acknowledged that as Commissioner Ms. Macrina had the authority to make such an award. She also answered to the City Council and the Mayor, which could have influenced her thinking. (Doc. 168-168-421, 424-426).

Ms. Macrina also signed off on having JP2 perform a "water reuse feasibility study". The payment for this work seemed likewise unusual to one witness because it was attached to unrelated task

10

orders for the Peyton Center. (Doc. 167-352-354). While the payment vehicle seemed unusual, witnesses fully supported the work and Ms. Macrina's foresight in funding ways to extend Atlanta's water supply. (Doc. 169-728-736).

Another project Ms. Macrina awarded to JP2 under the 7383 contract was Rodney Cook/Mims Park, a neighborhood prone to flooding. Ms. Macrina made another sole-source award to have PRAD continue work on that project, which had been previously performed by another engineering firm. One of the Deputy Commissioners thought there was "no compelling reason" to give this work to PRAD, but nevertheless signed off on it. (Doc. 167-367-368, 372-373).

Other DWM employees, the City Council, and the mayor all signed off on each of these three 7383 projects awarded to JP2. Some witnesses complained about the quality of JP2's work on these projects, much of which was performed after Ms. Macrina had been fired as the DWM Commissioner in May 2016.

### The Middle East Trip

Several weeks before she was fired in May 2016, Ms. Macrina participated in an international water conference in Abu Dhabi. As a presenter she described the work COA did to increase its water supply by the tunnel and quarry project. Unbeknownst to Ms. Macrina, Jafari asked one of his employees, Ferra Sabooni Cummings, to go and "take good care of" Ms. Macrina at that conference. (Doc. 170-970-971).

11

Ms. Cummings was originally from Iran, as is Jafari. He knew she was going to visit family back in Iran around the same time Ms. Macrina was scheduled to make her presentation at the water conference. He instructed Ms. Cummings to "make [Ms. Macrina] happy." (Doc. 170-971). Jafari also asked that Ms. Cummings buy some expensive jewelry for his wife Nancy Jafari while in the Middle East. (Doc. 170-979, 983-984).

While in the Middle East Ms. Cummings purchased two "friendship rings", one for her and the other for Ms. Macrina. Her credit card receipts showed the cost was approximately $1500. (Doc. 170-978-979, 982).

Ms. Cummings said she bought linens and luggage for Ms. Macrina. She said she bought these items with cash but had no receipts. (Doc. 170-977-978, 986).

Ms. Cummings also said she paid for an additional one night's stay for Ms. Macrina at the same high-end hotel Ms. Cummings was using. While her credit card showed a charge of $5,600 from the hotel, nothing corroborated that this fee was partially for Ms. Macrina's room. There was no evidence Ms. Macrina ever stayed at or was registered as a guest at this hotel. (Doc. 170-985).

Another part of Ms. Cummings' credit card receipts revealed payments for over $7,700 in jewelry. This was the jewelry Jafari asked that Ms. Cummings purchase for his wife Nancy. Ms. Cummings said after she bought this jewelry, she gave it to Ms. Macrina who

brought the items back to the United States and gave them to Nancy Jafari. (Doc. 170-983-984, 1033).

Ms. Cummings also paid for a first-class upgrade to Ms. Macrina's return flight back to Atlanta. Ms. Macrina repaid Ms. Cumming for this flight upgrade with a personal check shortly after they both were back in Atlanta. (Doc. 170-981).

### Landscaping

Joseph Vollero is a landscaper who knew Jafari socially. Jafari asked him to do landscaping for a "friend" who was out of town. Vollero and his crew did a general cleanup of Ms. Macrina's property, the total cost for which was approximately $1,000. Jafari paid for the work in cash. (Doc. 170-1075-1084, 1088).

Vollero met Ms. Macrina after she returned from the Middle East trip. She paid Vollero, via personal checks, for $3,300 in landscaping upgrades she needed to sell her house after she was fired by COA. (Doc. 170-1089-1091).

### Interactions with FBI and Consulting Work For PRAD

The day after she was fired from COA, Ms. Macrina reached out to the FBI to begin discussing corruption within COA government. Over the next 33 months she had at least 25 interactions in person and by phone with FBI Agents Brian Davis and Christy Parker. Agents and several federal prosecutors flew repeatedly to meet with Ms. Macrina in Florida, where she moved after finding work there. Agent Davis claimed it was just a "coincidence" that he and others

13

completed the internal FBI paperwork that began an overarching COA investigation shortly after his third meeting with Ms. Macrina. (Doc. 170-1151-1152).

During her tenure as DWM Commissioner, Jafari offered to hire Ms. Macrina to work at PRAD on several occasions. He wanted her to take over PRAD and expand it outside of Atlanta. (Doc. 169-838; Doc. 170-1058-1059). After she was fired, Ms. Macrina's friend Alan Barnes emailed her resume to Jafari to see if he was interested in hiring her at PRAD. (Doc. 169-848-852). A few weeks later Ms. Macrina began doing consulting work for PRAD during the summer and early Fall of 2016. (Doc. 168-579-586, Doc. 170-1042-1059). She received four $7,500 checks from PRAD for this work, two of which were cashier's checks obtained with cash withdrawn from the PRAD accounts, the other two were standard business checks. (Doc. 169-586-588).

A PRAD employee said that Jafari told her that if asked she should deny seeing Ms. Macrina at the PRAD offices. Nevertheless, Ms. Macrina told other engineers she was consulting for PRAD and that it did not involve COA work. (Doc. 169-687, 837). Ms. Macrina's work for PRAD and the checks she received were all during the time when she was cooperating with the FBI. She told the FBI about consulting work she did for PRAD. ((Doc. 170-1100). Around this same time, she told the FBI about issues pertaining to the award of the A&E contract. (Id.-1209-1211).

14

In one session with the FBI, Ms. Macrina told them about a meeting involving Jafari and Adam Smith, the former COA Chief of Procurement. Smith and Jafari were talking about how JP2 performed poorly in the first phase of the 7383 evaluations and would need to improve during the upcoming oral interviews. Ms. Macrina told the FBI that the oral interviews were a method to assure that "preferred vendors" would be selected. At another point she claimed it was her idea to have oral interviews. She told the FBI and federal prosecutors that Smith and Jafari were comfortable talking in front of her because she appeared to "play the game." Even after Ms. Macrina told this to the FBI the U.S. Attorney's office still planned on using her as a witness in the upcoming case against Jafari. (Doc. 170-1095-1099, 1102-1104, 1185).

Several years later the Government was preparing to indict Jafari. In what was to be a final prep session agents again flew to Florida in February 2019 to meet with Ms. Macrina. During this session Ms. Macrina told them Jafari gave her $10,000 in cash before her trip to the Middle East, got her brother a job, gave her two gift cards (which she threw away) and offered her a BMW. No evidence corroborated any job for the brother, the gift cards, or the vehicle. She also told agents about being with Ms. Cummings in the Middle East and that Jafari had offered her a job at PRAD if she left COA. (Doc. 170-1109-1114).

The Agents testified that all along during the preceding 30

15

months before February 2019 they had been asking Ms. Macrina whether she had accepted "anything of value" from any contractor who had COA work. The agents conceded that there is no mention of asking such questions of Ms. Macrina in their voluminous reports or in documents sent to their supervisors.  (Doc. 170-1194-1195).  Agents claimed such questions were not noteworthy at the time.  While none of their reports document that such questions were asked, agents did document mundane subjects such as an occasion when Ms. Macrina simply did not answer the phone when the agent called.  (Doc. 170-1208).

Agents planned a subsequent session during which they again went to Florida and met with Ms. Macrina.  This time they secretly recorded the interaction, which lasted around one hour and 45 minutes.

At trial, the prosecution played nine short segments, lasting approximately 8 minutes out of the 105-minute recording.  Ms. Macrina moved to admit other portions pursuant to Rule 106.  That request was denied on the basis that Ms. Macrina was not in detention when she met with the FBI.

### "Ethics" Evidence

Prior to trial Ms. Macrina moved in limine to prohibit the prosecution from introducing evidence about various COA ethical rules.  The lower court rejected this Motion. As a result, the jury was inundated with testimony and documents about COA ethics

16

rules, obligations, processes, potential sanctions for violations and disclosure reports filed by Ms. Macrina after she was fired. Her disclosure reports did not mention that Ms. Macrina took a job with PRAD or reference items provided by Ms. Cummings or the unsolicited landscaping work by Mr. Vollero. (Doc. 169-896-901, 904).

In the same vein, the prosecution presented evidence from multiple witnesses concerning "blackout" and "cooling off" periods. The former was a rule prohibiting employees from discussing upcoming contracts that were out for bid, even if the person with whom the COA employee was talking was a contractor, such as Jafari, who had current ongoing business under earlier contracts. The second was a rule holding that for one year after leaving COA former employees were prohibited from working on COA-related projects for other entities.

These discussions of ethical rules, conflicts of interest, disclosure reports and the blackout and cooling off periods dominated the trial. This criminal case turned into a civil dispute over whether Ms. Macrina violated COA ethical rules. (Doc. 167-220, 232-233, 239, 251-254, 258-259, 296, 304-305, 390); (Doc. 168-441-443); (Doc. 168-765-770), (Doc. 169-768, 802-804, 850, 886, 888, 892, 894-897, 900-901, 904, 916, 925); (Doc. 170-1099-1101, 1108, 1111, 1133-1134, 1162-1163, 1196, 1285, 1287, 1296); (Doc. 172-1364, 1367-1369, 1372, 1375, 1394, 1408.)

## STANDARD OF REVIEW

  I.  Evidentiary issues are reviewed for abuse of discretion. <u>United States v. Ware</u>, 69 Fed. 4th 830, 845 (11th Cir. 2023).

 II.  When the court improperly instructs the jury on the applicable law, a new trial is required unless it is clear beyond a reasonable doubt that the error did not contribute to the verdict—*i.e.*, that a properly instructed jury would have convicted anyway. <u>United States v. Takhalov</u>, 827 F.3d 1307, 1320-24 (11th Cir. 2016).

## SUMMARY OF THE ARGUMENT

  I.  The District Court allowed the prosecution to play eight minutes out of Appellant's 105-minute recorded statement, while preventing Appellant from introducing additional segments that were necessary to qualify, explain, and place into context the prosecution's snippets. In the District Court's view, Appellant's statements were inadmissible under Federal Rule of Evidence 106 because she was not "detained" when making the statements. No such requirement is found in Rule 106. The lower court misapplied binding precedent and ignored persuasive authority. This error harmed Appellant.

 II.  The lower court allowed the prosecution to introduce an avalanche of irrelevant municipal "ethics" evidence into this federal criminal corruption case. The volume of and

repeated prosecution arguments about the ethics evidence
was so harmful that this Court should reverse Appellant's
convictions.

III. The District Court erroneously refused to tell the jury
that 18 U.S.C. §666(a)(1)(B) prohibits bribery, but not
gratuities, as numerous circuits have held. The Government
argued that Ms. Macrina agreed to accept certain things of
value from Jafari <u>after</u> performing government acts
benefiting Jafari. If the jury accepted this construction
of the facts it would be a gratuity, not a bribe. Ms.
Macrina's request that the District Court instruct the jury
on the crucial bribery-gratuity distinction was rejected.
The failure to provide this jury instruction harmed Ms.
Macrina and this Court should reverse her convictions.

**ARGUMENT AND AUTHORITY**

**I.    The District Court Erred by Holding that Rule 106 Only
Applies to Statements While in Detention and Thus
Prohibited the Defense from Using Additional Portions of
Appellant's Recorded Interview That "in Fairness" Should
Have Been Presented to the Jury.**

The District Court ruled that Ms. Macrina could not introduce
under Rule 106 parts of the secretly recorded meeting with the FBI
that were necessary "to qualify, explain [and] place into context"
the portions introduced by the Government. <u>United States v.
Pendas-Martinez</u>, 845 F.2d 938, 944 (11th Cir. 1988).  The lower
court erred.

19

The prosecution used 8 minutes extracted from the 105-minute secretly recorded session between Appellant and the two FBI agents to whom she had been providing information for almost three years. Pursuant to Federal Rule of Evidence 106 Ms. Macrina moved to introduce additional excerpts to qualify, explain and place into context the prosecution's extracts. The District Court prohibited Ms. Macrina from doing so, holding that Rule 106 only applies to statements made while in detention.

The District Court's ruling disregarded the plain language of Rule 106, misapplied authoritative Eleventh Circuit cases and ignored persuasive precedent from sister circuits. The District Court erred, and this error was prejudicial. This Court should reverse Ms. Macrina's convictions.

**A.   The District Court's Ruling Violates the Plain Language of Rule 106.**

Rule 106 says:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time.

"Because the Federal Rules of Evidence are a legislative enactment," this Court must use "traditional tools of statutory construction" to "construe" Rule 106. _Beech Aircraft Corp. v. Rainey_, 488 U.S. 153, 163, 109 S. Ct. 439, 446, 102 L. Ed. 2d 445 (1988). "Traditional tools of statutory construction," of course, must begin "with the statutory text, and proceed from the

20

understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." Sebelius v. Cloer, 569 U.S. 369, 376, 133 S.Ct. 1886, 185 L.Ed.2d 1003 (2013).

Rule 106, by its plain and "ordinary" terms, focuses on "fairness." It does not make exceptions for criminal cases, hearsay statements, or statements made outside of detention. In both civil and criminal trials Rule 106 asks if any recorded statement "in fairness ought to be considered at the same time" as another recorded statement.  The rule applies to both written and oral statements.  See United States v. Pacquette, 557 F. App'x 933, 935–36 (11th Cir. 2014).

The Advisory Committee note to Rule 106 says it is "based on two considerations." "The first is to correct a misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial."

The District Court held that Rule 106 does not apply when the other parts of a statement which "in fairness" should be presented to the jury were made by a criminal Defendant who is not detained. This ruling ignored the plain language of and essentially rewrote Rule 106.

**B.** **The District Court's Ruling Violates Binding Eleventh Circuit Precedent.**

Not only did the lower court ignore the plain language of Rule 106, its ruling does not square with Eleventh Circuit precedent. None of the earlier Rule 106 cases from this Circuit condition Rule 106 on whether the statement was made in detention.

In <u>United States v. Baker</u>, 432 F.3d 1189, 1223 (11th Cir. 2005), this Court reversed the trial court for failure to admit an accused's exculpatory hearsay statements to the police. "Under the Rule 106 fairness standard, the exculpatory portion of the defendant's [hearsay] statement should have been admitted if it was relevant to an issue in the case and necessary to clarify or explain the portion received." <u>Id</u>.; <u>United States v. Pacquette</u>, 557 F. App'x 933, 937 (11th Cir. 2014) (reversing conviction because defendant should have been allowed to "clarify the meaning" of his out-of-court statement by "present[ing] other necessary portions"). Neither case says Rule 106 only applies to post-detainment statements.

None of the cases cited by the lower court supports its holding that the rule of completeness is limited to post-detainment statements. In fact, one of the opinions relied upon by the District Court does not even specify whether the Defendant was in custody or detained when the statement at issue was made. <u>United States v. Pacquette</u>, <u>supra</u>. There, the defendant flew to Miami from the U.S. Virgin Islands. A border official encountered the

22

Defendant "while he was disembarking from the airplane" and continued talking with him "in the inspection area." Id. at 935. The opinion does not say that the defendant was detained before making the statements at issue.

The District Court's ruling relied heavily on the principle that a criminal defendant generally may not introduce self-serving exculpatory hearsay. (Doc. 109, 5-7). While that may be true, Baker and Pacquette show that Rule 106 is an exception to that prohibition. If the "no use of self-serving hearsay" principle swept as broadly as the District Court found, it would swallow Rule 106.

Nothing in the Eleventh Circuit's caselaw or the text of the Rule limits it to an accused's post-detention statements. The District Court simply misapplied Rule 106 and this Court's earlier cases.

### C. <u>Other Circuits Hold That the Rule of Completeness Renders Otherwise Inadmissible Evidence Admissible.</u>

Not only did the lower court misapply Rule 106 and this Court's earlier decisions, it also ignored instructive lessons from the Supreme Court and other Circuits. These other authorities teach that when properly applied the Rule of Completeness and FRE 106 allow otherwise inadmissible evidence into a trial when "in fairness" it should be considered by the finder of fact.

In <u>Beech Aircraft Corp. v. Rainey</u>, the Supreme Court wrote that "when one party has made use of a portion of a document, such

23

that misunderstanding or distortion can be averted only through presentation of another portion, the material **_required for completeness_** is _ipso facto_ relevant and therefore admissible under Rules 401 and 402." 488 U.S. 153, 172, 109 S. Ct. 439, 451, 102 L. Ed. 2d 445 (1988). The Supreme Court called this "obvious." Id.

Similarly, virtually every circuit has held that Rule 106 and the rule of completeness render admissible that which would otherwise be inadmissible. See, e.g., United States v. Sutton, 801 F.2d 1346, 1368 (D.C. Cir. 1986) (the rule of completeness "can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously."); U.S. v. Bucci, 525 F.3d 116, 133—134 (1st Cir. 2008) (Rule 106 "may be invoked to facilitate the introduction of otherwise inadmissible evidence"); United States v. Coplan, 703 F.3d 46, 84—85 (2d Cir. 2012); U.S. v. Gravely, 840 F.2d 1156, 1163 (4th Cir. 1988); United States v. Portillo, 969 F.3d 144, 176 (5th Cir. 2020); U.S. v. LeFevour, 798 F.2d 977, 980—82 (7th Cir. 1986); United States v. Lopez, 4 F.4th 706, 715 (9th Cir. 2021); U.S. v. Lopez-Medina, 596 F.3d 716, 735—736 (10th Cir. 2010).

These rulings align with evidentiary treatises. Scholars recognize that "Rule 106 makes inadmissible evidence admissible[.]" 21A Charles Alan Wright et al., Fed. Prac. & Proc.

Evid. § 5078  (2d ed.); see also Christopher B. Mueller & Laird C. Kirkpatrick, Fed. Evid. § 1:43 (4th ed.) ("surely" a hearsay objection should not "stand in the way" of admission of evidence under Rule 106).

In Sutton, the D.C. Circuit outlined three reasons supporting this line of cases.  First, the rule of completeness contains no proviso found in every major rule of exclusion in the evidence rules, like, "except as otherwise provided by these rules."  Id. "[T]he draftsmen [of the Federal Rules of Evidence] knew of the need to provide for relationships between rules and were familiar with a technique for doing this."  Id.  Because "[t]here is no such proviso in Rule 106," it should not be "restrictively construed" to mean that an accused cannot admit exculpatory hearsay under the Rule.  Id.  Second, privilege was the only limitation on the common law doctrine of completeness.  Id.  Hearsay was not a limitation.  Id.  Finally, as a matter of basic fairness the Government should not be permitted to misrepresent or distort the meaning of evidence it introduces in a criminal case against an accused.  Id.

The lower court ignored precedent from this and other Circuits.  By focusing on whether the additional portions Ms. Macrina sought to admit were "self-serving hearsay," the District Court ignored that the Rule asks whether additional material should

"in fairness" be presented to the jury.  Not only did the District Court err, as shown below that error was harmful.

### D.  **Prejudice.**

This Court looks to whether an erroneous evidentiary ruling was harmful to the Defendant in a criminal case.  See United States v. Ware, 69 Fed. 4th 830, 845 (11th Cir. 2023).  Here, the lower court's ruling allowed the prosecution to present a distorted version of Ms. Macrina's statements to the FBI in a secretly recorded meeting.  At trial, the prosecution relied on the distortion to argue that Ms. Macrina must be guilty.  As a result, the District Court's erroneous application of Rule 106 was prejudicial and harmful.  This Court should therefore reverse her convictions.

### 1)  What the Jury Heard

There was no dispute at trial that Ms. Macrina accepted cash from Jafari prior to her trip to the Middle East.  The dispute was whether that cash was a bribe.

The lower court allowed the Government to play 8 minutes from the 105-minute recording of her interview.  These soundbites told an incriminating tale: Jafari offered Ms. Macrina cash prior to a trip to the Middle East, she accepted it, took it to the Middle East, spent most of it on valuable goods, and kept the change.

The Government cherry-picked a few brief segments from the recording that supported its view.  The bits the prosecution played

depicted Ms. Macrina saying Jafari gave her "several thousand" dollars before the trip, (Doc.134-1-3; Doc.170-1118), that "he told [her she] could spend it on — on anything [she] wanted," (Doc.134-1-10; Doc.170-1120), and that "[she] spent … close to all of [it]," (Doc.134-1-12; Doc.170-1175). As for the leftover cash, the Government played a segment of the recording during which a FBI agent claimed that Ms. Macrina "told us [she] kept … several thousand dollars," (Doc.134-1-3; Doc.170-1201, 1172), and that she "kept the cash," (Doc.134-1-11; Doc.170-1201, 1172).

### 2)   What the Jury Did Not Hear

Ms. Macrina asked for permission to play additional parts of the same recording that were "necessary to qualify, explain, or place into context" the Government's excerpts. <u>Pendas-Martinez</u>, 845 F.2d at 944. If those other portions had been played, then the jury would have heard Ms. Macrina tell the agents that Jafari's cash was not for her, she spent it all on Jafari's wife, she did not use or keep any of Jafari's cash for herself, and she gave Jafari everything she bought for his wife with his cash. In sum, her statements would have "qualif[ied], explain[ed], or place[d] into context" the statements the prosecution admitted.

The jury here never heard Ms. Macrina deny using Jafari's cash to buy goods for herself. "MALE AGENT: [] [Y]ou said [Jafari invited you to use the cash he gave you to] buy what you wanted

for yourself. MS. MACRINA: But I didn't. I had my own money." (Doc. 134-1-13).

Likewise, the jury never heard Ms. Macrina deny keeping any of Jafari's cash: "No, I didn't keep any of his cash.". (Id.-39— 40).

Further, the jury did not hear Ms. Macrina explain she used her own cash to buy herself goods: "I bought stuff for myself with my own money." (Id.13—14).

The jury also never heard Ms. Macrina tell the FBI that she did not accept Jafari's cash for herself, "I wasn't taking the cash for me." (Id.23-24).

The lower court would not allow the defense to play the part of the recording in which Ms. Macrina said she spent Jafari's cash only for buying his wife goods, and that she "gave Jafari all the stuff [she] had that [she] got for his wife." (Id.28—29).

### 3) The Government Exploits the Error

The Government amplified the lower court's error during questioning of other witnesses and arguments to the jury. In Opening Statements, while questioning witnesses, and during closing arguments, the United States repeatedly told a misleading tale based on its selected parts of the interview, a tale very different from what is found in the defense extracts.

In Opening Statement, the Government told jurors they would hear a confession from Ms. Macrina. The prosecution contended that

28

Ms. Macrina confessed to receiving a bribe. (Doc. 167-193). She "admitted to receiving cash" from Jafari. (Id.-192). "Jo Ann Macrina admit[ted] and t[old] the FBI that she had received some benefits from Jeff Jafari." (Id.)

The prosecution amplified the out-of-context excerpts when questioning witnesses. For example, the Government asked the City's Chief Ethics Officer: "Q: And would the receipt of cash from a City of Atlanta vendor be a violation of the City of Atlanta ethics code? A: Yes, it would. Q: Is that the ethics code that Jo Ann Macrina agreed to abide by? A: Yes, it is." (Doc. 169-925).

Next, the Government hammered home during closing arguments its version based on the selected 8-minute excerpts. (Doc. 172-1377) She "admitted that Jeff Jafari had given her $10,000[.]"); (Doc. 172-1409). She "admitted[] Jeff Jafari gave [her] $10,000"). (Doc. 171-1258). She "confessed" to receiving "benefits" from Jafari. (Id.) The prosecution tightened the screws: "[t]here was no explanation for the cash that Jeff Jafari gave her, that cash bribe in April of 2016." (Doc. 172-1410, 1409 ("[W]hat I didn't see an explanation for was the cash that Jeff Jafari gave Jo Ann Macrina in April 2016.").) There was an "explanation," but the jury did not hear it because of the District Court's ruling.

In yet another way the prosecution profited during closing arguments: "[Y]ou heard the recordings where she said different amounts. But at no time does she say he gave me zero dollars. In

29

those she always said he gave her some amount, the amount just changed and fluctuated." (Doc. 172-1409-10). In fact, she repeatedly told the FBI that the cash was not for her, but the jury never heard that either.

Most damaging, the prosecutor in closing argument urged jurors to find one of the elements of the charged crime based on its use of select and misleading excerpts: "[Y]ou can check … off" the "element" related to Ms. Macrina "solicit[ing], demand[ing], accept[ing], or agree[ing] to accept a thing of value" because "Jo Ann Macrina accepted cash" from Jafari. (Doc. 172-1378).

The prosecution's tactics worked, but only because the jury did not hear Ms. Macrina's explanations and denials: "I wasn't taking the cash for me," "I didn't keep any of his cash," "I didn't [use his cash to buy anything for myself] … I had my own money," and "I bought stuff for myself with my own money."

After hearing only the government's side of the recording, it was no surprise the jury concluded that Ms. Macrina took a bribe. United States v. Lopez, 4 F.4th 706, 715 (9th Cir. 2021), *cert. denied*, 214 L. Ed. 2d 33, 143 S. Ct. 121 (2022) ("The first step in the district court's error was the erroneous conclusion that the Government's selectively edited excerpts accurately presented the content of [Defendant's] statements. On a fair review of the interrogation recording, it should have been apparent that the [government's] excerpts risked misleading the jury by making it

30

seem as though [Defendant] confessed … , in reality, the full recording conveys a different impression.").

### 4)  The Government Cannot Avoid the Prejudice

The Government may argue that any error was "cured".  These arguments have no merit.

The defense tried to fight the prejudice from the Government's misleading excerpts by pointing out certain stray references in the Government's snippets, like: "I bought his wife stuff that I gave him. I don't have it… I gave him the stuff[.]" (Doc. 134-1). However, such statements appeared random and unsupported without the additional statements Ms. Macrina moved to admit.  In the excerpts Ms. Macrina sought to use, she clarified why Jafari asked her to get items for his wife in the first place (Id.-13, 20), how she initially rebuffed the request (Id.-23), why she ultimately agreed to buy his wife gifts and how she regretted agreeing because of the optics (Id.-33).

The Government may also contend that the lower court's ruling was harmless because of other supposed "bribes" (e.g., the ring and shopping trip with Ms. Cummings, landscaping work, and $30,000 earned for work at PRAD).  However, it is impossible to tell from the general verdict whether the jury convicted based on the cash or some other alleged bribe.  The Government appears to agree: "the jury can consider … testimony they may have heard about benefits received by Ms. Macrina … it's obviously up to the jury

31

to decide that, is it a bribe or is it not a bribe." (Doc. 171-1355).    Because this Court "cannot isolate the jury's consideration" of the cash from the other alleged bribes, a new trial is required. <u>United States v. Fattah</u>, 914 F.3d 112, 154 (3d Cir. 2019); <u>see also Percoco v. United States</u>, 215 L. Ed. 2d 305, 143 S. Ct. 1130, 1139 (2023).

**II.   The District Court's Erroneous Decision to Allow Evidence of Ethics Rules in a Federal Bribery Trial was Repeatedly Exploited by the Prosecution and Therefore Harmed Appellant.**

The District Court erred by allowing evidence and argument about City of Atlanta ethics rules in a federal bribery trial. Ethics rules do not make any fact of consequence more or less probable in a federal bribery case.  Even if ethics evidence had some tangential relevance, it was "substantially outweighed by a danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."    Fed. R. Evid. 403.    Those dangers overwhelmed Ms. Macrina's trial.

The Government presented so much ethics evidence that the prosecution's criminal case morphed into a municipal ethics hearing.  During the five-day trial: 1) the Government introduced reams of City ethics rules and training materials into evidence, 2) the Government used terms and phrases from the ethics rules hundreds of times in questioning and argument, 3) eight of the Government's fifteen witnesses testified about ethics violations

and related issues, culminating in a lengthy exegesis from the COA Chief Ethics Officer, and 4) the Government focused its jury arguments on these supposed municipal ethics violations: "[H]ow do we know that Jo Ann Macrina acted corruptly? Well, she lied in her financial disclosure form." (Doc. 171-1379). By the end of trial, the jury was misled and confused into thinking an ethics violation was tantamount to a violation of 18 U.S.C. §666(a)(1)(B). Unsurprisingly, the jury asked during its deliberations: "What is a definition of an 'unlawful' act"? (Oct. 13, 2022, T.2).

Ms. Macrina will first establish that the ethics evidence was simply irrelevant. Next, she will show that any tenuous relevance was far outweighed by the danger and prejudice from using this material. Finally, Ms. Macrina will demonstrate that the erroneous admission of and repeated prosecution arguments about the ethics rules and issues prejudiced the defense so significantly that this Court should reverse her convictions.

**A.    City of Atlanta Ethics Rules Were Not Relevant to Whether Ms. Macrina Violated 18 U.S.C. §666(a)(1)(B).**

Evidence and argument about ethics rules had no probative value. City ethics rules had nothing to do with Ms. Macrina's guilt or innocence under the statute at issue. The Supreme Court has discussed how federal-programs bribery statutes do not proscribe violations of City ethics rules. Kelly v. United States, 140 S. Ct. 1565, 1566, 206 L. Ed. 2d 882 (2020); Skilling v. United States, 561 U.S. 358, 408-11 (2010). "[§666] do[es] not authorize

33

federal prosecutors to 'set[ ] standards of disclosure and good government for local and state officials.'"    <u>Kelly</u>, 140 S. Ct. 1565, 1566.

Many courts have excluded evidence about compliance with state (and local) laws from federal public corruption trials. <u>United States v. Lupton</u>, 620 F.3d 790, 800 (7th Cir. 2010) (proper to exclude expert testimony that "related not to the [federal] statutes Lupton was charged with violating [18 U.S.C. §§666, 1343 & 1346] but rather to state statutes"); <u>United States v. Terry</u>, No. 1:10-cr-390, 2011 WL 2149361, at *4 (N.D. Ohio May 31, 2011) (excluding evidence of judicial ethics code violations in honest-services case because defendant was not charged with "violating ethical rules"); <u>United States v. Washington</u>, 887 F. Supp. 2d 1077, 1106 (D. Mont. 2012) (evidence concerning "compliance with state law" was irrelevant "as Defendants are charged with a federal crime"); <u>United States v. Urciuoli</u>, 613 F.3d 11, 15–16 (1st Cir. 2010) (rejecting the argument that the jury should have been instructed on legality of defendant's actions under state law); <u>United States v. Stewart</u>, 433 F.3d 273, 312 & n.11 (2d Cir. 2006) (proper to exclude evidence about legality of stock trades because "legal status of insider trading" was "not relevant to the charges").

This same principle about the irrelevance of state and local laws in federal criminal cases arises in federal drug cases when

the conduct occurs in a jurisdiction where the accused's conduct was legal. In these cases, courts routinely find that state law is irrelevant in a federal criminal trial. See, e.g., United States v. Haymon, No. 20-4438, 2021 WL 4495813, at *1 (4th Cir. Oct. 1, 2021) (affirming conviction and approving exclusion of evidence about California state marijuana laws in Controlled Substance Act prosecution because "California state laws were irrelevant and inapplicable"); see also United States v. Walsh, 654 F. App'x 689, 696 (6th Cir. 2016) (affirming the trial court's exclusion of evidence and argument regarding compliance with state drug laws on the ground that such compliance was "irrelevant when considering a defendant's guilt or innocence under federal law"); United States v. Jonathan William Wall, Case 1:19-cr-00500-SAG, (D. Md. Apr. 28, 2022), ECF No. 200 at 1; United States v. Washington, 887 F. Supp. 2d 1077, 1106 (D. Mont. 2012); United States v. Jenkins, 2014 WL 12676280, at *4 (W.D. Mich. Aug. 20, 2014).

Sometimes the shoe is on the other foot, as when a federal prosecutor contends that a Defendant's compliance with state ethics laws is simply irrelevant. See, e.g., U.S. Mot. in Lim. at 25, United States v. Silver, No. 1:15-cr-00093 (S.D.N.Y. Sept. 14, 2015) (Doc. 56) (moving to exclude evidence regarding "compliance or non-compliance with State law or ethical rules" because defendant "has been charged with federal crimes, not State crimes or violations of attorney ethics rules"), U.S. Mot. in Lim. at 11,

United States v. Joel Iverson Gilbert, et. al, No. 2:17-cr-00419-AKK-TMP (N.D. Al. May 25, 2018) (Doc. 162)("[S]tate ethics law is not relevant to the federal [bribery] charges the defendants face [under 18 U.S.C. §666].")

These cases all teach the same point: City ethics rules are irrelevant in a federal public corruption trial. The ethics rules in this case, admitted and discussed *ad nauseum*, did not make any fact "of consequence" more "probable". As a result, such evidence was not relevant under Fed.R.Evid. 401.

> **B.    Even If Ethics Rules Had Some Tangential Relevance, It Was Substantially Outweighed by the Danger of Unfair Prejudice, Confusing the Issues, Misleading the Jury, Undue Delay, Wasting Time, or Needlessly Presenting Cumulative Evidence.**

Whatever marginal relevance ethics rules arguably had in Ms. Macrina's trial, the Government's heavy focus on these rules prejudiced Ms. Macrina. The sheer volume of this evidence led to jury confusion. Pursuant to Rule 403, the ethics evidence never should have been admitted into evidence.

Over the course of the five-day trial, the Government hammered its ethics evidence. It introduced the COA ethics code and disclosure forms. The prosecution elicited extensive ethics-based testimony from eight of its fifteen trial witnesses, including the COA Chief Ethics Officer. The trial transcript contains hundreds of references to these ethics rules and issues. Various terms like "conflict of interest," "disclosure form," "prohibited

source," "blackout period," "cooling off period," and "cone of silence" peppered the trial, appearing dozens of times in a 1,445-page trial transcript.

From beginning to end, the Government fed the jury a steady diet of alleged ethics violations. The prosecution began this theme during Opening Statements. "The evidence will show that while Jo Ann Macrina was commissioner for the Department of Watershed Management she repeatedly flouted these procedures that were set up for honest brokering and contracting to benefit one man, Jeff Jafari." (Doc. 167-181). And later: "The evidence will show that each of these steps violated and were contrary to policy in the City of Atlanta." (Id.-184). "Everyone in the scheme recognized that [violating the Ethics code's one-year "cooling off period"] was wrong." (Id.-190). "[S]he had hundreds of contacts with Jeff Jafari" during a "blackout period" under City ethics rules. (Id.-193).

The Government continued its emphasis on ethics issues when questioning witnesses. To illustrate:

Q: You mentioned a city vendor. Would a vendor seeking a contract with the City of Atlanta be a prohibited source. A: Yes. … That provision … it's really to make sure that employees, as well as officials, understand that when they have a financial or personal interest, they can't participate in a specific matter or contract. ((Doc. 169-894,895).

 Q: Succinctly, when an employee has a financial interest in a matter are they permitted to participate in that matter? A: Yeah, they should not be involved in it. Because you now have a conflict. You have a conflict, because you have some kind of benefit that's—

37

that may benefit you or may benefit somebody that falls into one of these categories. (Id.-888).

Q: Did Jo Ann Macrina agree to file her financial disclosure statement. A: Yes. Q: And did she agree to file reports on conflicts of interest, travel, or gifts to the city when appropriate? A: Yes. (Id.-895-896).

Q: Did Jo Ann Macrina agree not to violate that one-year cooling off period? A: Yes. (Id.-896-897).

Q: What did Jo Ann Macrina report? A: She reported no. Q: Did she disclose working for Jeff Jafari in 2016? A: No, that's not listed on this form. Q: Did she disclose working for PRAD in 2016? A: No, that's not listed on this form. (Id.-900-901).

Q: Did she report any money received from Jeff Jafari or PRAD? A: I don't see that on this form, no. (Id.- 901).

Q: And for this report, did she report anywhere that Jeff Jafari or PRAD gave her cash or anything else for this trip? A: I don't see that listed here. Q: Did she report that Farrah Sabooni gave her anything for this trip? A: No, I did not see that listed here. (Id.-904).

Q: And would the receipt of cash from a City of Atlanta vendor be a violation of the City of Atlanta ethics code? A: Yes, it would. Q: Is that the ethics code that Jo Ann Macrina agreed to abide by? A: Yes, it is. (Id.- 925).

Q. And that would have been a violation of the rules? A. Yes, it would have been. (Doc. 171-1286).

Q. And if you had done that, it would have been a violation of the rules, correct? A. Yes. (Id.-1288).

Q. And if you had stayed on the evaluation, despite having a job offer with one of the vendors, again, that would have been a violation of the City of Atlanta rules. A. Yes. (Id.-1289).

More than half of the prosecution's trial witnesses were questioned about ethics rules or related issues:  (Doc. 167-239; (Doc.168-441-444); (Doc. 169-757-770); (Doc. 169-850); (Doc. 169-

857–859); (Doc. 169–881–905); (Doc. 170–1099–1100, 1125–1138); (Doc. 170–1196).

Closing argument was more of the same: repeated references to and arguments about the ethics evidence. "Jo Ann Macrina in doing so violated the blackout period." (Doc. 172–1367). "[T]o influence someone to attend on behalf of a vendor would have been a violation of those ethical rules that the evaluators were obligated to abide by." (Id.–1367). "Why would she risk breaking the rules?" (Id.–1372). "Jo Ann Macrina's work for Jeff Jafari was in violation of that cooling off period, that one-year period when City of Atlanta employees shouldn't work on City of Atlanta matters[.]" (Id.–1375). "Nowhere on this form did she disclose that she had done work for Jeff Jafari or that he gave her that money, including the $30,000." (Id.–1376). "Jo Ann Macrina also violated the City rules showing her corrupt intent." (Id.– 1379). "[T]he ethics officer for the City of Atlanta, the highest-level person in the ethics office … explained that there is an obligation to fill out that [disclosure] form the year after you leave the City of Atlanta … [Ms. Macrina] filled it out, she attested that it was true, she signed it electronically and she lied in it." (Id.–1408). The Government summed up its theory: "[H]ow do we know that Jo Ann Macrina acted corruptly? Well, she lied in her financial disclosure form." (Id.–1379, 1376 ( "Jo Ann Macrina also violated the City rules showing her corrupt intent").)

39

Rule 403 requires a balancing between potentially relevant material and the undue harm and prejudice such information may cause. This Court has reversed convictions for improper Rule 403 balancing by a trial judge. United States v. Hands, 184 F. 3d 1322 (11th Cir. 1999) (reversing convictions where domestic violence evidence likely to incite jury to irrational decision). Other courts have done the same. See, e.g., United States v. Fulmer, 108 F. 3d 1486 (1st Cir. 1997); United States v. Ham, 998 F. 2d 1247 (4th Cir. 1993) United States v. Adams, 772 F. 3d 788 (6th Cir. 2013); United States v. Fawbush, 634 F. 3d 420 (8th Cir. 2011).

Here, any possible relevance was far outweighed by the dangers of admitting substantial COA ethics evidence in a 18 U.S.C. §666(a)(1)(B) trial. The jury was misled and confused into believing that Ms. Macrina's federal criminal trial was about whether she complied with municipal ethics rules, when really it was supposed to be about whether she violated 18 U.S.C. §666(a)(1)(B). As will be shown next, the Government exploited this confusion to its benefit.

## C. **The Court's Error was Prejudicial.**

The Government's voluminous ethics evidence was deeply prejudicial because the City ethics provisions proscribe vastly different conduct than §666. As a result, the jury became confused about the lines between ethics violations and §666(a)(1)(B). That

confusion culminated in the jury asking during deliberations for the definition of an "unlawful act."

The sheer volume of ethics evidence made juror confusion likely. The jury heard about the elements of §666(a)(1)(B) only one time during the final jury instructions. In contrast, the prosecution elicited hundreds of references to ethics rules throughout the trial.

The differences between the ethics rules and §666(a)(1)(B) amplified the danger of juror confusion. The City ethics rules are a strict liability administrative code. In contrast, §666(a)(1)(B) requires proof of corrupt intent. That distinction alone is fertile ground for juror confusion. Furthermore, some benefits that may arguably breach the strict liability City ethics rules would not violate §666(a)(1)(B). See United States v. Jennings, 160 F.3d 1006, 1020 (4th Cir. 1998) (§666 "does not reach mere goodwill gifts" because "the gravamen of a bribery offense is a payment made to corruptly influence or reward an official act.")

The Government's evidence and arguments blurred these and other critical distinctions between City ethics rules and §666, and in doing so, misled the jurors and confused the issues. See, e.g., United States v. Lupton, 620 F.3d 790 (7th Cir. 2010) ("testimony about [compliance with state statutes in a federal bribery case] would have been of limited value at best and unduly confusing at worst" because it was "tangential to the crucial

questions the factfinder had to answer, namely whether the government could prove beyond a reasonable doubt the elements of 18 U.S.C. §§666, 1343 & 1346").

The District Court did give a very brief instruction to the jury about the ethics rules: "[Y]ou have heard evidence about various City of Atlanta ethics rules. This is a federal trial, and the defendant is not on trial for violating any City ethics rules. Defendant is only on trial for violating the federal laws…" Doc. 172-1426.) This terse directive was too little, and too late to make a difference. It failed to address the mountain of ethics-related evidence. Jurors were given the impossible task of disentangling ethics evidence from the Government's theory that Ms. Macrina was guilty of federal bribery because she violated City ethics rules and failed to fill out some City forms properly. A rational juror would ask why there was so much evidence and debate about ethics if ethics were not part of a violation of 18 U.S.C. §666(a)(1)(B).

The Government may contend that there is no prejudice because Ms. Macrina questioned witnesses about the differences between federal court and a COA ethics tribunal. There is no merit to such a claim. Ms. Macrina was left with a Hobson's choice: ignore the ethics evidence or confront it. Ignoring it suggested she was guilty, while confronting it suggested ethics were so pivotal that the defense needed to fight back. The problem, of course, is that

Ms. Macrina never should have been put into the position of making this choice.

The Government's excessive reliance on ethics rules led to obvious confusion among the jurors. They asked for a definition of the term "unlawful act." While the general verdict form did not ask whether the jury convicted Ms. Macrina for violating City ethics rules, that is exactly what the Government's presentation repeatedly invited the jury to do.

The lower court abused its discretion in allowing the Government to admit voluminous municipal ethics evidence. Ms. Macrina was prejudiced. This Court should reverse.

### III. The District Court Erroneously Instructed the Jury

The trial court—over timely and repeated objections (Doc.95 at 44; Doc. 172-1341-3)—erroneously instructed the jury on a crucial point of law. As a result, this Court should reverse the convictions.

The trial court refused to instruct the jury that 18 U.S.C. §666(a)(1)(B) prohibits bribes, but not gratuities. Yet, caselaw, the text, context of and legislative history for §666 all demonstrate that it does not cover gratuities. As discussed below, one reasonable construction of the evidence here reveals that Ms. Macrina received, at most, gratuities, but not bribes. The bribery-gratuity distinction went to a key issue at the heart of the case—whether Ms. Macrina agreed to accept things of value

before she performed Government business (a bribe), or whether her agreement to accept the items came after she took steps that benefited Jafari (a gratuity).   Because §666 does not cover gratuities, it was an error of law not to tell the jury that they could not convict Ms. Macrina if they concluded that any agreement to accept things of value from Jafari came after Ms. Macrina performed Government business favoring Jafari.

### A.   **18 U.S.C. §666 Proscribes Bribes, Not Gratuities.**

The text, statutory context, legislative history, and persuasive circuit cases interpreting §666 establish that the statute covers bribes, not gratuities.   By rejecting a jury instruction to this effect, the lower court erred.

### 1)   Caselaw

Multiple cases establish that §666 is a bribery statute and does not cover gratuities.  Salinas v. United States, 522 U.S. 52, 58, 118 S. Ct. 469, 474, 139 L. Ed. 2d 352 (1997) ("666(a)(1)(B) was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds."); United States v. Fernandez, 722 F.3d 1, 20–27 (1st Cir. 2013) ("We therefore hold that gratuities are not criminalized under §666."); United States v. Hamilton, No. 21-11157, 2022 WL 3593974 at *3–*8 (5th Cir. Aug. 23, 2022) ("§666 applies only to quid pro quo bribery"); United States v. Jennings, 160 F.3d 1006, 1015 & nn.3—4 (4th Cir. 1998) ("In any event, a

court squarely addressing the issue could reasonably conclude that §666(a)(2) prohibits bribes, but not gratuities.").

The critical distinction between a bribe and a gratuity is "the timing of the agreement to make or receive a payment[.]" Fernandez, 722 F.3d at 19. With a bribe, "the offer of payment precedes the official act[,]" and with a gratuity, it comes after. Id. at 23. "[I]f the agreement to exchange a thing of value for an act is made after that act has been performed, that agreement cannot properly be viewed as an agreement to offer or accept a bribe." Id. at 19; United States v. Quinn, 359 F.3d 666, 675 (4th Cir. 2004).

The Eleventh Circuit has not addressed whether §666 prohibits gratuities. In the unreported case of United States v. Jackson, 688 F. App'x 685, 694 (11th Cir. 2017), the Court noted that §666(a)(1)(B) "may cover a payment for a past act," which is true of a bribe promised before a government act and paid after. Fernandez recognizes as much: "the payment of a bribe can occur after the act … so long as the agreement to pay the bribe for the act or acts is made before the act or acts[.]" Fernandez, 722 F.3d at 23. Thus, Jackson does not resolve whether §666 prohibits bribes only. United States v. McNair, 605 F.3d 1152 (11th Cir. 2010) held that §666(a)(1)(B) and (a)(2) do not require proof that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo*. But McNair

says nothing about whether §666 criminalizes an agreement to accept a thing of value formed after taking government action.

### 2)    Statutory Text

The text of §666 supports the conclusion that the statute proscribes bribes, not gratuities.  The term "gratuity" does not appear in §666's title, the text of the law, or its legislative history. "Surely the word … was not foreign to Congress in 1986." Fernandez, 722 F.3d at 25.  The term "gratuity" appears in §201, a different federal anti-bribery law that pre-dates §666.  Section 666 was modeled on §201, suggesting Congress intentionally omitted the term from §666.  The "chronology" of §666(a)(1)(B) and its "statutory language" "demonstrate [] §666(a)(1)(B) was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds." Salinas, 522 U.S. 52, 58, 118 S. Ct. 469, 474.  "Congress enacted §666 and made it clear that federal law applies to bribes of the kind offered to the state and local officials in Del Toro, as well as those at issue in Mosley and Hinton."  Id.  In Del Toro, Mosley, and Hinton the defendants agreed to accept things of value before taking government action, textbook bribes.

The only arguable textual basis to support the idea that §666 proscribes gratuities is the statute's "ambiguous use of [the] word 'reward.'"  Fernandez, 722 F.3d at 25.  That term "is open to (at least) two different interpretations." Id.  "Under the second

interpretation, the word 'reward' does not create a separate gratuity offense in §666, but rather serves a more modest purpose: it merely clarifies 'that a bribe can be promised before, but paid after, the official's action on the payor's behalf.'" Id. (quoting United States v. Jennings, 160 F.3d 1006, 1015 n.3 (4th Cir.1998)).

The second interpretation of the term "reward" is correct. Fernandez, 722 F.3d at 23. Where "a payment was made … to induce [a public official] to vote in a certain way" there is "influence," and where "a promise of payment was made, contingent upon [a] [] vote; once the [] vote[] [occurs] in the way the payor requested, a 'reward.'" Id.; see also Hamilton, 2022 WL 3593974, at *6. This reading aligns with the "traditional meaning of the term 'reward' as something offered to induce another to act favorably on one's behalf[.]" Jennings, 160 F.3d at 1015 n.3. Thus, the term "reward" merely shows that "the payment of a bribe can occur after the act that is the subject of the bribe is completed[.] Id.; see also BRIBE, Black's Law Dictionary (11th ed. 2019) (defining "bribe" as, in part, a "reward" "promised").

### 3) Statutory Context

The statutory context of §666 likewise shows that it targets bribes, not gratuities. "[M]uch of the relevant language [in §666] originates in" §201, and "it is therefore useful to take a step back and place §666 into statutory context[.]" Fernandez, 722 F.3d at 201; Justin Weitz, Note, *The Devil is in the Details: 18*

47

*U.S.C. §666 after* Skilling v. United States, 14 N.Y.U. J. Legis. & Pub. Pol'y 805, 816 (2011) ("[Section 666] was born as the stepchild of another statute, 18 U.S.C. §201."). Section 201 separates the crimes of illegal bribes and illegal gratuities into two sections: "§201(b) outlaws the offering of bribes to public officials, as well as the acceptance of bribes by those officials, while §201(c) outlaws the offering and acceptance of illegal gratuities." Fernandez, 722 F.3d at 20. By contrast, §666 does not have separate sections for bribes and gratuities; it does not use the term gratuity at all. It is "unlikely that Congress would condense two distinct offenses [i.e., bribes and gratuities] into the same subsection in §666 when the statute upon which it is based [§201] has separate subsections for each offense." Id.; Hamilton, 2022 WL 3593974, at *6 ("[I]t is unlikely that §666's two subsections covers all of what §201's four subsections do[.]").

Yet another statutory context clue points to §666 targeting bribes, not gratuities: the "dramatic discrepancy in maximum penalties" between §666 and §201. Fernandez, 722 F.3d at 24; Hamilton, 2022 WL 3593974, at *6. Whereas "any violation" of §666 carries a fine and a term of imprisonment of "not more than 10 years," a violation of §201(c) (the gratuity provision) carries a term of imprisonment of "not more than 2 years." Fernandez, 722 F.3d at 24. It is doubtful Congress wanted payment of a gratuity to a local official to be punished five times more seriously than

48

payment of a gratuity to a federal official.  If anything, the federal government wants to punish federal officials more harshly for accepting gratuities because, of course, state and local prosecutors can also target local corruption.  Id.

### 4)  Legislative History

Furthermore, §666's legislative history demonstrates that the statute proscribes bribes, not gratuities.  The statute's legislative history does not mention gratuities.  Further, in 1986, Congress amended §666 in two ways that suggest the statute does not target gratuities.

First, Congress replaced the statutory language "for or because of" with "intending to be influenced or rewarded" in §666(a)(1)(B) and "with intent to influence or reward" in §666(a)(2).  This change is "especially notable" because the "pre-amendment language was similar to that found in 18 U.S.C. §201(c)—§201's gratuity provision."  Fernandez, 722 F.3d at 20.  The "post-amendments language is much closer to that found in 18 U.S.C. §201(b)—§201's bribery provision."  Id.

Second, in 1986, Congress added the "word 'corruptly' to the beginning of §666(a)(1)(B) and (a)(2)."  Id.  "[T]his is another instance where the language of §666 was amended in a way that brought the statute closer to §201's bribery provision."  Id.  Whereas the word "corruptly" appears in §201's bribery provision, it does not appear in its gratuities provision.  Id.

49

### 5)    Rule of Lenity

Applicable caselaw, the text, statutory context, and legislative history of §666 show that it proscribes bribes, not gratuities. If there is any ambiguity about whether §666 prohibits gratuities, that imprecision should be resolved in Ms. Macrina's favor under the rule of lenity. <u>Skilling v. United States</u>, 561 U.S. 358, 410, 130 S. Ct. 2896, 2932, 177 L. Ed. 2d 619 (2010); After holding that §666 proscribes bribes, not gratuities, the Fifth Circuit went on: "In the alternative, under the rule of lenity, we must resolve all reasonable doubts about the meaning of §666 in [Defendant's] favor." <u>Hamilton</u>, No. 21-11157, 2022 WL 3593974, at *6. This Court should follow suit and find the rule of lenity applies.

### B.    <u>The Lower Court Erred by Failing to Instruct the Jury that Ms. Macrina Was Charged with Accepting Bribes, Not Gratuities.</u>

Ms. Macrina asked for a jury instruction to the effect that the statute only covers bribes, not gratuities. The District Court refused. (Doc. 171-1339-1343). This was a legal error.

### 1)    The Lower Court Refuses to Instruct About Gratuities

Ms. Macrina proposed a Jury Instruction advising jurors that §666(a)(1)(B) does not apply when "…a public official accept[s] or agree[s] to accept a thing of value after performing government business, a government transaction, or a series of government transactions." (Doc. 94-25).

50

Instead of giving Ms. Macrina's requested instruction, the trial court only instructed the jury on the elements of §666. The jury was told to consider whether Macrina "was an agent of the City of Atlanta" who "accepted or agreed to accept a thing of value" and who, "in return for the acceptance or agreement to accept, [] intended to be influenced or rewarded for a transaction or series of transactions of the City of Atlanta involving something worth $5,000 or more[.]"  (Doc. 171-1422).

The Government admitted that it was "up to the jury to decide" whether a thing of value allegedly accepted by Ms. Macrina was a "bribe."  (Doc. 171-1355).  Despite this concession, the lower court would not tell the jury that a gratuity is different from a bribe, and that the former does not violate §666.  Without the bribery-gratuity dichotomy in mind, jurors had no legal rules to help them evaluate the gratuity evidence.  The jury was not told what to do if they concluded that Ms. Macrina decided to accept the benefits at issue only after she performed government acts favoring Jafari.

The District Court provided a terse reason why it rejected Ms. Macrina's proposed Jury Instruction on the inapplicability of §666 to gratuities: "I may be misinterpreting McNair, but I don't think the Eleventh Circuit -- I'm not going to charge it. I note your exception."  (Doc. 172-1343).  The pattern §666 instruction the District Court used is "not infallible" and "do[es] not

51

represent binding law." United States v. Focia, 869 F.3d 1269, 1283 (11th Cir. 2017). Pattern instructions must be supplemented if a defendant requests a modified instruction that is correct, not adequately covered by the pattern charge, and pivotal to the defense case. Id. at 1282; United States v. Ruiz, 59 F.3d 1151, 1154-55 (11th Cir. 1995) (reversing when district court refused to supplement pattern instruction with a correct statement of law that model charge "did not focus on"). That is what happened here.

When the court misinstructs the jury on the applicable law, a new trial is required unless it is clear beyond a reasonable doubt that the error did not contribute to the verdict—i.e., that a properly instructed jury would have convicted anyway. United States v. Takhalov, 827 F.3d 1307, 1320-24 (11th Cir. 2016). This standard "is not easy for the government to meet," United States v. Robison, 505 F.3d 1208, 1223 (11th Cir. 2007), and here the government cannot meet it.

### 2)   Jurors Should Have Been Informed Gratuities Are Not Prohibited by §666

A jury instruction that modifies a pattern instruction should be used when it is correct, is not adequately covered by the pattern charge, and is pivotal to the defense case. United States v. Ruiz, supra. Here, the evidence can reasonably be construed as a gratuity. However, the lower court refused to tell jurors how they should resolve the case if they determined Ms. Macrina only decided to accept things of value after she performed government

business for Jafari's benefit.  This refusal to instruct the jury was an error of law that requires reversal of Ms. Macrina's convictions.

It is undisputed that Ms. Macrina did not accept any things of value before she allegedly took government actions favoring Jafari in 2014, 2015, and the first three months of 2016.[3]  The cash, ring, shopping trip, and the landscaping work all happened in late April and early May 2016. Then Ms. Macrina got fired May 21, 2016.  From June to August 2016 she worked for Jafari's company as an independent contractor, earning $30,000.  In short, the jury could reasonably construe the facts as showing an agreement to accept things of value <u>after</u> performing government actions benefiting Jafari—<u>i.e.</u>, gratuities.

A bribe may be promised before government action and paid after, but there is no evidence of this here.  There is no evidence that Jafari promised Ms. Macrina future undisclosed benefits at the time she allegedly took government actions favoring Jafari in 2014, 2015, and the first three months of 2016.

Only two trial witnesses had direct involvement with the alleged bribe scheme;  the landscaper and Jafari's employee. Neither testified that Ms. Macrina accepted or agreed to accept benefits from Jafari in exchange for government acts.

---

[3] There is no evidence that Ms. Macrina took any government acts benefiting Jafari in April or May 2016 before she was fired on May 21, 2016.

### 3) Government's Arguments Have No Merit

The Government will likely claim no error from the jury instructions. Such claims have no merit.

The Government may contend that a gratuity instruction was unnecessary because Jafari promised Ms. Macrina future work at PRAD in 2014-2015 when she was performing acts allegedly benefiting him. This claim does not withstand scrutiny. The lower court still should have told jurors about the distinction between bribery and gratuities. Because the facts around the alleged benefits show they can be reasonably viewed as gratuities, it is unclear whether a properly instructed jury would have convicted anyway. Takhalov, 827 F.3d at 1320-24.

To begin with, it is impossible to tell from the general verdict whether the jury convicted based on the Government's theory about the promise of the PRAD job and PRAD payments, or some other thing of value. Because this Court "cannot isolate the jury's consideration" of the job from the other alleged benefits, a new trial is required. United States v. Fattah, 914 F.3d 112, 154 (3d Cir. 2019); Percoco v. United States, 215 L. Ed. 2d 305, 143 S. Ct. 1130, 1139 (2023).

Second, the evidence can also be construed reasonably to establish that any agreement by Ms. Macrina to accept things of value happened after she took actions that benefitted Jafari. She got the cash and Middle East gifts and the landscaping long after she awarded sole source work to Jafari's company. The jury should

have been instructed on how to handle this alternative construction of the facts.

The need for this additional jury instruction is amplified when considering the prosecution's alternative arguments. Although the Government contended that the alleged PRAD job offer and PRAD payments were part of an "ongoing bribe," (Doc. 167–189, 194), it also conceded that Ms. Macrina earned at least some of the PRAD payments for work she performed at PRAD as a private citizen. Notwithstanding the Government's "ongoing bribe" argument, it admitted in closing arguments that Macrina "did do some work" to earn the $30,000. (Id.-1375). "You saw the defense exhibits that were e-mails showing that Jo Ann Macrina was doing some work for Jeff Jafari's company at this time." (Id.)   The Government ostensibly admitted that $22,500 of the $30,000 was earned: "[T]he defense does not have the burden, but you will note in the exhibits there are no e-mails showing that Jo Ann Macrina did any work for PRAD in June of 2016 when she got that first cashier's check for $7,500." (Doc. 172-1375).   In other words, the prosecution itself conceded its "ongoing bribe" theory had grave weaknesses, yet the jury had no guidance about how to handle the case if they agreed that the evidence might not support the idea that the PRAD job offer had all along been the thing of value that prompted Ms. Macrina to take steps which benefitted Jafari.

Failing to instruct the jury on the bribery/gratuity distinction was harmful because there was a reasonable construction of the evidence that Ms. Macrina violated the latter and not the former. An agreement by which a private citizen accepts payments from a private company for work performed for the private company simply cannot constitute a bribe in violation of §666, for the basic reason that the person is not at that point a government agent. Jurors needed legal rules to guide them if they focused on the work at PRAD after Ms. Macrina was fired from COA. Even if earned compensation could somehow qualify as a gratuity (it does not), Ms. Macrina has already established that §666 only covers bribes, not gratuities. If Ms. Macrina's supposed decision to accept the PRAD job was a thing of value, jurors could have decided that happened after she left COA. That is the classic definition of a gratuity, which is not covered by §666. The problem, of course, is that the jury never got an instruction about how it should resolve the case under this construction of the facts.

Third, the best construction of the evidence is that Ms. Macrina accepted or agreed to accept a job offer from Jafari long after she performed any of the alleged Government acts that benefitted Jafari. After she was fired, it was a Government witness (Alan Barnes) who submitted her resume to PRAD so she could apply for a job there. (Doc. 169-851-2). There is simply no

evidence that Jafari ever promised her a job. This is clearly the better construction of the evidence considering that while consulting for Jafari and PRAD she was telling the FBI that the company was at the heart of ongoing corruption.

The Government might also argue that the term "corrupt" in the instructions distinguishes lawful from unlawful benefits. Such an argument bears no weight. The word "corrupt" is a guardrail only if the jurors have been instructed that a gratuity is not "corrupt" under §666.

The lower court erred in not providing Ms. Macrina's proposed jury instruction. This instructional error was harmful. This Court should therefore reverse Ms. Macrina's convictions.

## CONCLUSION

This Court should reverse Ms. Macrina's convictions and remand for a new trial.

Dated: This <u>19th</u> day of July 2023.

Respectfully submitted,

PAUL S. KISH
ATTORNEY FOR JO ANN MACRINA
GEORGIA STATE BAR NO. 424277

Kish Law LLC
229 Peachtree Street, N.E.
Suite 2505
Atlanta, Georgia 30303
404-207-1338
paul@kishlawllc.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing filing into this Court's ECF System, which will automatically forward a copy to counsel of record in this matter.

Dated: This 19th day of July 2023.

/s/ Paul S. Kish
PAUL S. KISH
ATTORNEY FOR JO ANN MACRINA
GEORGIA STATE BAR NO. 424277

Kish Law LLC
229 Peachtree Street, N.E.
Suite 2505
Atlanta, Georgia 30303
404-207-1338
paul@kishlawllc.com

58