No. 23-10734-A

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JO ANN MACRINA,

*Defendant-Appellant.*

---

On appeal from the United States District Court
for the Northern District of Georgia
No. 1:20-CR-00216-SCJ-LTW-1

---

## BRIEF OF APPELLEE
## THE UNITED STATES OF AMERICA

---

RYAN K. BUCHANAN
*United States Attorney*

NATHAN P. KITCHENS
*Assistant United States Attorney*

600 United States Courthouse
75 Ted Turner Drive S.W.
Atlanta, GA 30303
(404) 581-6000

No. 23-10734-A

*United States of America v. Jo Ann Macrina*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In addition to those listed in the Certificate of Interested Persons and
Corporate Disclosure Statement included with Appellant's brief, the
following people have an interest in the outcome of this appeal:

Amundson, Corey, Chief, DOJ Public Integrity Section

Buchanan, Ryan K., United States Attorney

Erskine, Kurt R., former United States Attorney

Pak, Byung J., former United States Attorney

United States of America, Appellee

No publicly traded company or corporation has an interest in the
outcome of the case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case. The issues and positions of the parties, as presented in the record and briefs, are sufficient to enable the Court to reach a just determination.

## TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ............................................................. C-1

Statement Regarding Oral Argument ................................................ i

Table of Contents ........................................................................... ii

Table of Citations .......................................................................... v

Statement of Jurisdiction ................................................................ x

Statement of the Issues .................................................................. 1

Statement of the Case .................................................................... 2

    A. Course of Proceedings and Disposition Below ................... 2

    B. Statement of the Facts ..................................................... 2

        1. City of Atlanta bribery scheme ...................................... 2

        2. Macrina's recorded statement ........................................ 14

        3. Jury instructions ........................................................... 17

    C. Standard of Review .......................................................... 19

Summary of the Argument ............................................................. 20

Argument and Citations of Authority ............................................. 22

1. The district court did not abuse its discretion in excluding self-serving hearsay from Macrina's non-custodial recorded statements when admitted portions of the recording did not distort the meaning of her statements or exclude exculpatory information .................................................................. 22

    A. Neither the plain language of Federal Rule of Evidence 106 nor Eleventh Circuit authority required the admission of Macrina's pre-arrest statements when Macrina failed to proffer the specific portions of her self-serving hearsay she sought to introduce until after trial ..................................... 22

B. Even if the rule of completeness applied to non-custodial statements, Macrina's proffered additional statements were not necessary to correct any distortion in, or explain, the government's admitted excerpts from her recording. ......... 28

C. Any error in the exclusion of portions of Macrina's recorded statements was harmless given the overwhelming evidence of her receipt of things of value from Jafari. .......................... 32

2. The district court did not abuse its discretion in admitting evidence relating to Macrina's violations of the City of Atlanta's Code of Ethics, which was probative of her corrupt intent to give Jafari preferential treatment and not unduly prejudicial. . 35

A. Evidence of relevant provisions of the Code of Ethics was probative of Macrina's intent to benefit Jafari because of his bribes. ................................................................. 36

B. The high probative value of Code of Ethics evidence was not substantially outweighed by the danger of unfair prejudice or jury confusion, particularly when the district court gave a limiting instruction to the jury. .......................................... 41

C. Any error from the admission of the Code of Ethics evidence was harmless given the extensive evidence of her corrupt intent. .................................................................. 45

3. The district court did not abuse its discretion in denying Macrina's jury instruction on 18 U.S.C. § 666, which was contrary to binding Circuit precedent and misstated the law. . 47

A. Macrina's proposed instruction misstated the law by incorrectly suggesting that the receipt of benefits after conducting government business does not violate Section 666. ................................................................. 48

B. The omission of Macrina's proposed jury instruction did not seriously impair her defense when the government presented no argument that Macrina accepted gratuities. . . 51

iii

Conclusion.................................................................................55

Certificate of Compliance and Service .........................................56

# TABLE OF CITATIONS

**Federal Cases**

*Bravo-Fernandez v. United States,*
  580 U.S. 5 (2016) ............................................................................48

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ........................................................................27

*United States v. Abbey,*
  560 F.3d 513 (6th Cir. 2009) .........................................................49

*United States v. Almanzar,*
  634 F.3d 1214 (11th Cir. 2011) ....................................................44

*United States v. Bahel,*
  662 F.3d 610 (2d Cir. 2011) ..........................................................48

*United States v. Baker,*
  432 F.3d 1189 (11th Cir. 2005) ...............................................26, 32

*United States v. Barton,*
  909 F.3d 1323 (11th Cir. 2018) ............................................. passim

*United States v. Branch,*
  91 F.3d 699 (5th Cir. 1996) ...........................................................28

*United States v. Calhoon,*
  97 F.3d 518 (11th Cir. 1996) .........................................................42

*United States v. Costner,*
  684 F.2d 370 (6th Cir. 1982) ...................................................28, 29

*United States v. Cunningham,*
  194 F.3d 1186 (11th Cir. 1999) ....................................................25

*United States v. Elkins,*
  885 F.2d 775 (11th Cir. 1989) .................................................42, 44

*United States v. Fattah,*
  914 F.3d 112 (3d Cir. 2019) ..........................................................34

*United States v. Fawbush,*
  634 F.3d 420 (8th Cir. 2011) .........................................................44

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Fernandez,
    19-15044 & 19-15165,
    2022 WL 3581793 (11th Cir. Aug. 22, 2022)............ 36, 37, 43, 44

United States v. Fernandez,
    722 F.3d 1 (1st Cir. 2013)................................................. 48, 50, 51

United States v. Fulmer,
    108 F.3d 1486 (1st Cir. 1997) .......................................................44

United States v. Gaines,
    690 F.2d 849 (11th Cir. 1982)......................................................52

United States v. Garrido,
    713 F.3d 985 (9th Cir. 2010)........................................................49

United States v. Grubb,
    11 F.3d 426 (4th Cir. 1993)....................................................38, 44

United States v. Ham,
    998 F.2d 1247 (4th Cir. 1993)................................................44, 45

United States v. Hamilton,
    46 F.4th 389 (5th Cir. 2022) ..................................................49, 53

United States v. Hands,
    184 F.3d 1322 (11th Cir. 1999)....................................................44

United States v. Hawkins,
    777 F.3d 880 (7th Cir. 2015).......................................................48

United States v. Haymon,
    No. 20-4438, 2021 WL 4495813 (4th Cir. Oct. 1, 2021) .............41

United States v. Holden,
    557 F.3d 698 (6th Cir. 2009).......................................................25

United States v. Ignasiak,
    667 F.3d 1217 (11th Cir. 2012)....................................................35

United States v. Jackson,
    688 F. App'x 685 (11th Cir. 2017) ..........................................37, 50

United States v. Jenkins,
    No. 14-CR-72, 2014 WL 12676280 (W.D. Mich. Aug. 20, 2014).41

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

vi

*United States v. Jennings,*
     160 F.3d 1006 (4th Cir. 1998) ................................................. 49, 51

*United States v. Jeri,*
     869 F.3d 1247 (11th Cir. 2017) ..................................................... 32

*United States v. Johnson,*
     579 F. App'x 867 (11th Cir. 2014) ............................................... 31

*United States v. King,*
     351 F.3d 859 (8th Cir. 2003) ................................................... 23, 24

*United States v. King,*
     713 F.2d 627 (11th Cir. 1983) ..................................................... 42

*United States v. Larranaga,*
     787 F.2d 489 (10th Cir. 1986) ..................................................... 23

*United States v. LeFevour,*
     798 F.2d 977 (7th Cir. 1986) ....................................................... 28

*United States v. Lewis,*
     919 F.2d 146 (9th Cir. 1990) ....................................................... 31

*United States v. Long,*
     574 F.2d 761 (3d Cir. 1978) ........................................................ 36

*United States v. Lupton,*
     620 F.3d 790 (7th Cir. 2010) ....................................................... 40

*United States v. Martinelli,*
     454 F.3d 1300 (11th Cir. 2006) ................................................... 54

*United States v. Maxwell,*
     579 F.3d 1282 (11th Cir. 2009) ............................................... 47, 53

*\*United States v. McNair,*
     605 F.3d 1152 (11th Cir. 2010) ............................................ passim

*\*United States v. Ndiaye,*
     434 F.3d 1270 (11th Cir. 2006) ............................................ passim

*United States v. Neder,*
     197 F.3d 1122 (11th Cir. 1999) ................................................... 35

*United States v. O'Sullivan,*
     361 F. App'x 993 (11th Cir. 2010) ............................................... 42

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Pacquette,*
    557 F. App'x 933 (11th Cir. 2014) ................................................26

*\*United States v. Pendas-Martinez,*
    845 F.2d 938 (11th Cir. 1988)................................................25, 31

*United States v. Range,*
    94 F.3d 614 (11th Cir. 1996)........................................................26

*United States v. Roberson,*
    998 F.3d 1237 (11th Cir. 2021)........................................ 34, 35, 39

*United States v. Salesman,*
    467 F. App'x 835 (11th Cir. 2012) ................................................37

*\*United States v. Santos,*
    947 F.3d 711 (11th Cir. 2020) ......................................................26

*United States v. Simms,*
    385 F.3d 1347 (11th Cir. 2004)...............................................28, 29

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) .................................................40, 41

*United States v. Terry,*
    No. 1:10-CR-390, 2011 WL 2149361 (N.D. Ohio May 31, 2011) 40

*United States v. Tinoco,*
    304 F.3d 1088 (11th Cir. 2002)...............................................36, 41

*\*United States v. Umbach,*
    708 F. App'x 533 (11th Cir. 2017) ................................................23

*United States v. Urciuoli,*
    613 F.3d 11 (1st Cir. 2010)..........................................................40

*United States v. Vernon,*
    593 F. App'x 883 (11th Cir. 2014) ...........................................24, 25

*United States v. Walsh,*
    654 F. App'x 689 (6th Cir. 2016) .................................................41

*United States v. Washington,*
    887 F. Supp. 2d 1077 (D. Mont. 2012) ........................................41

*United States v. White,*
    663 F.3d 1207 (11th Cir. 2011)....................................................39

\*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Zimmerman,*
    509 F.3d 920 (8th Cir. 2007)....................................................48, 49

**Federal Statutes**

18 U.S.C. § 201(b) ...............................................................................49

18 U.S.C. § 201(b)(2)(C) .....................................................................36

18 U.S.C. § 201(c) ...............................................................................49

18 U.S.C. § 371 .....................................................................................2

18 U.S.C. § 666 .............................................................................passim

18 U.S.C. § 666(a) ...............................................................................49

18 U.S.C. § 666(a)(1)(B) ................................................................2, 49

18 U.S.C. § 3231 ...................................................................................x

18 U.S.C. § 3742 ...................................................................................x

26 U.S.C. § 7206 ...................................................................................2

28 U.S.C. § 1291 ...................................................................................x

**State Statutes**

Fla. Stat. § 943.12(3), 943.1395(1) ....................................................37

**Federal Rules**

Fed. R. App. P. 4(b)(1)(A) ....................................................................x

Fed. R. App. P. 32(a)(5).......................................................................56

Fed. R. App. P. 32(a)(6).......................................................................56

Fed. R. App. P. 32(a)(7)(B)..................................................................56

Fed. R. App. P. 32(f) ............................................................................56

Fed. R. Evid. 106 ...........................................................................passim

Fed. R. Evid. 401 .................................................................................36

Fed. R. Evid. 402..............................................................................36, 38

Fed. R. Evid. 403............................................................. 38, 41, 42, 44

**Other Authorities**

Bureau of Prisons,
    www.bop.gov (last visited September 13, 2023) ..............................2

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

No. 23-10734-A

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JO ANN MACRINA,

*Defendant-Appellant.*

## STATEMENT OF JURISDICTION

(A)  The district court had subject matter jurisdiction over the underlying criminal case based on 18 U.S.C. § 3231.

(B)  The court of appeals has jurisdiction over this direct appeal from the judgment and sentence of the district court, under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

(C)  While not jurisdictional, the notice of appeal was timely filed on March 6, 2023, within 14 days of the entry of the district court's judgment and commitment order, on February 24, 2023. Fed. R. App. P. 4(b)(1)(A).

(D)  This appeal is from a final judgment and commitment order that disposes of all the parties' claims in this criminal case.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in excluding self-serving hearsay offered under Federal Rule of Evidence 106 when Jo Ann Macrina's proposed excerpts from her recorded statement were cumulative of admitted portions of the recording and extensive evidence established her bribery scheme.

2. Whether the district court abused its discretion in admitting Code of Ethics evidence that established the standards of conduct for Macrina's job and highlighted her departures from ordinary duties to favor the bribe payer.

3. Whether the district court abused its discretion in rejecting Macrina's proposed jury instruction that benefits accepted after government action do not violate 18 U.S.C. § 666, which does not accurately state the law.

## STATEMENT OF THE CASE

**A. Course of Proceedings and Disposition Below**

Jo Ann Macrina was charged in an indictment with conspiratorial bribery under 18 U.S.C. § 371 (Count 1), substantive bribery under 18 U.S.C. § 666(a)(1)(B) (Count 2), and aiding and abetting the preparation of a false tax return under 26 U.S.C. § 7206 (Count 3). (Doc. 1). The government dismissed Count 3 of the indictment before the trial commenced. (Doc. 107). A jury convicted her of the remaining two counts of the indictment. (Doc. 127). Macrina was sentenced to 54 months' imprisonment on both counts, with both prison terms to run concurrently; three years of supervised release; a $200 special assessment; and $40,000 in restitution. (Doc. 143).

Macrina timely appealed and is currently incarcerated. (Doc. 152); *see* www.bop.gov (last visited September 13, 2023).

**B. Statement of the Facts**

**1. City of Atlanta bribery scheme**

The indictment alleged that Macrina conspired to accept bribes, and in fact accepted bribes, from City of Atlanta contractor Lohrasb "Jeff" Jafari while she served as a cabinet-level city official, during which her department awarded contracts worth millions of dollars to

Jafari's company and joint venture projects of which that company was a partner. (Doc. 1 ¶¶ 4–5, 10–15).

At trial, multiple current and former City of Atlanta employees testified about Macrina's role as Commissioner of the Department of Watershed Management, a cabinet-level position in city government. (Doc. 167 at 47). The Department of Watershed Management is the City of Atlanta's water utility that provides drinking water and wastewater treatment services. (*Id.* at 47–48, 145). Cristi Bickham, a former contracting officer and Department of Watershed Management employee (*id.* at 46), provided an overview of the city's procurement process. After the city issued a solicitation for new projects, potential vendors would submit proposals discussing their qualifications, and city evaluators would review the proposals and recommend selected vendors. (*Id.* at 50–51).

One contract subject to the procurement process was the Architecture and Engineering Contract, or the A&E Contract. (*Id.* at 56–57). This was a "lucrative" city-wide contract for pre-approved contractors that any city department could task for design projects, and the Department of Watershed Management was the heaviest user of the contract. (*Id.* at 57, 151–53). Each city department would select a specific A&E vendor for a particular task order, or project, and

Macrina had the authority to select vendors for the Department of Watershed Management from 2013 to 2016. (Doc. 168 at 81).

Jafari's company received nearly $35 million in projects from the original A&E contract, the most of any A&E vendor, including $13.2 million in just the nine-month period from December 2014 to September 2015. (Doc. 167 at 159). Robert Bocarro, a former Deputy Commissioner in the Department of Watershed Management (*id.* at 149), noted that Jafari's company was "getting behind" on its task orders, aside from a complex task order for a large water supply contract, and "[t]he quality of the work was not as good." (*Id.* at 162).

In anticipation of the expiration of the original A&E contract in December 2014, the City of Atlanta issued a request for proposals for a new A&E contract on August 1, 2014. (*Id.* at 60, 62). After the release of the proposal package, the city instituted a "blackout period" that "strictly prohibited" potential contractors from talking about the new A&E contract with any city employee except for Bickham. (*Id.* at 64, 69–70). The request for proposals stated that oral interviews "may" be conducted, which meant that oral interviews were not mandatory and would only take place if the evaluation committee "believe[d] that they need additional information" or needed clarification on the written proposals. (*Id.* at 56, 65, 71; Doc. 168 at 89).

Eleven contractors submitted proposals for the new A&E contract, including Jafari's joint venture. (Doc. 167 at 75). After receiving the proposals, the evaluation committee, which consisted of city employees selected by each department that used the A&E contract, scored each of the eleven proposals over three days in November 2014 on criteria set forth in the request for proposals. (*Id.* at 78–79, 91–92). Under the city's collaborative scoring model, each evaluator provided his or her initial score for each criterion, and the evaluators would then discuss until reaching a consensus score. (*Id.* at 55, 96–97; Doc. 169 at 111–12). The original evaluation committee did not request any oral interviews before scoring the proposals. (Doc. 167 at 102, 140; Doc. 168 at 94; Doc. 169 at 120). Based on the collaborative scoring, the evaluation committee ranked Jafari's company tied for eighth place among the eleven proponents. (Doc. 167 at 100–01). Because only six vendors were selected for the new A&E contract, Jafari's company would not have been selected for the contract based on its ranking. (*Id.* at 101; Doc. 169 at 118–19).

Macrina then made a series of decisions that worked to the benefit of Jafari. First, although the November 2014 evaluation was intended to be the final evaluation for the A&E contract, Macrina requested a reevaluation. (Doc. 168 at 94–97). Keith Brooks, the former Principal Deputy Chief Procurement Officer, testified that a request for

5

rescoring of evaluations only happened once or twice during his 23-year tenure, and he believed there was no need to re-score the A&E evaluation. (*Id.* at 77, 97–98, 158; *see also* Doc. 169 at 160, 202).

Second, Macrina and a Department of Watershed Management employee she selected, Jay Ash, replaced two members of the evaluation committee. (Doc. 167 at 105–06; Doc. 168 at 43). Brooks testified that changing evaluators before vendors were selected was not "common" and that it slowed down the selection process. (Doc. 168 at 99–100). Moreover, Brooks had never seen a commissioner serve on an evaluation committee before Macrina, which he believed created a perception that department heads "could influence the process because of their title, their weight, among other evaluators." (*Id.* at 100). Bickham likewise testified that it was not "typical" for a commissioner to be selected as an evaluator because "you don't want a situation where someone could be influenced by . . . their boss." (Doc. 167 at 54). Macrina and Ash received evaluator training, which instructed them that evaluators could not accept "anything of value from any person or entity that is a prospective proponent," "disclose any confidential information," or have any "financial or personal interest" in any proponent. (Doc. 167 at 106; Doc. 168 at 46–47).

Third, although the original evaluation committee did not request any oral interviews, Macrina requested oral interviews for the second

6

evaluation. (Doc. 170 at 147–48, 242–43). Based on the request for oral interviews, the original evaluation scores were removed from consideration, and the second evaluation committee started with a blank slate. (*Id.* at 152, 243). At the same time, Macrina directly communicated with Jafari about the upcoming interviews for the A&E contract. (Doc. 169 at 172–73).

Fourth, Macrina requested that George Ajy, an engineer for a rival contractor bidding for the A&E contract, participate in the oral interview for Jafari's company to assist Jafari's proposal. (Doc. 169 at 23–24). Kimberly Ajy, who co-owned the rival contractor with her husband George, testified that this was an "odd request" because her company was competing with Jafari's company for the A&E contract, and she understood that Macrina made this request because their company "gave [Jafari's] team credibility" and Jafari "needed help to win the contract." (*Id.* at 12, 23–24).

Fifth, Macrina was a "vocal" participant on the second evaluation committee when it conducted a new round of collaborative scoring. (Doc. 168 at 56). During this scoring session, Macrina was "outspoken throughout the process," scored Jafari's company as high or higher than any other evaluator in every category, and "influence[d] the others to increase their scores." (Doc. 167 at 110–14, 139; Doc. 168

7

at 54–57).[1] As a result of the reevaluation, Jafari's company's ranking increased from tied for eighth to second place, resulting in his company's selection as an A&E vendor. (Doc. 167 at 114–15).

Bocarro also testified about two specific task orders that Macrina awarded to Jafari's company against his recommendation. First, Jafari's company received the task order to design the Peyton Center, a "very important" operational and administrative building. (*Id.* at 170–72). Macrina selected Jafari's company to complete this project in a sole-source contract, which Bocarro did not recommend and believed was "unusual" because involving multiple contractors typically resulted in the "most innovative ideas" and "best value" to the city. (*Id.* at 177–78, 187). In addition, Macrina requested that the task order include an additional roughly $570,000 for a water reuse feasibility study unrelated to the Peyton Center, which inflated the amount paid to Jafari's company despite Bocarro's efforts to cut costs on the task order. (*Id.* at 181, 184–85; Doc. 169 at 93).

Second, Macrina selected Jafari's company to design Rodney Cook Park, which was a "significant task order" designed to relieve flooding in a low-income neighborhood near downtown Atlanta. (Doc. 167 at

---

[1] Macrina called Jay Ash, a member of the second evaluation team, as a defense witness. (Doc. 171 at 48). Ash denied that Macrina pressured him to give Jafari's company a particular score during the evaluation. (*Id.* at 52).

193–96; Doc. 168 at 29). Macrina selected Jafari's company for this task order against Bocarro's recommendation and contrary to the standard system of awarding task orders only after multiple A&E contractors submitted proposals. (Doc. 167 at 203; Doc. 168 at 40). In addition, Macrina selected Jafari's company even though another A&E vendor had conducted preliminary work for the park design, and Bocarro believed it was "unusual to switch horses, to change to another consultant." (Doc. 167 at 203). Bocarro raised objections with Macrina, who provided no explanation for her selection of Jafari's company. (*Id.* at 204; Doc. 168 at 40).

In total, Jafari's company received approximately $26 million in task orders under the new A&E contract in early 2016 while Macrina served as commissioner, more than half of the dollars awarded under the new A&E contract to that point. (Doc. 168 at 112–15). After Macrina was fired from the City of Atlanta in May 2016, however, Jafari did not receive any task orders from the Department of Watershed Management over $1 million. (Doc. 167 at 207; Doc. 168 at 116–17).

Trial testimony revealed that Macrina received a multitude of benefits from Jafari at the same time she gave him preferential treatment in city contracts. Jafari "agreed to have [Macrina] or promised her to be the CEO or in a leadership position with his firm"

whenever she left the City of Atlanta. (Doc. 169 at 24). Jafari made this promise to Macrina repeatedly while she served as commissioner. (*Id.* at 24–25, 175; Doc. 170 at 154, 239–40, 245). After the City of Atlanta fired Macrina, she worked at Jafari's company, and some of her work for Jafari involved projects she approved while serving as commissioner mere weeks before joining Jafari. (Doc. 169 at 24, 28).

Macrina did limited work for Jafari's company in return for her salary, including a day spent reviewing resumes for engineers in late July 2016. (Doc. 168 at 213; Doc. 170 at 87–91, 111). There was no evidence that Macrina performed any work for Jafari's company before July 2016, but she nonetheless received $7,500 in June 2016 from Jafari. (Doc. 171 at 13–15). Jafari paid her two cashier's checks for $7,500 each in June and July 2016 and two personal checks for $7,500 each in August and September 2016. (Doc. 168 at 192; Doc. 171 at 13–15).

Following Macrina's departure, the City of Atlanta investigated an allegation that Jafari hired Macrina in violation of the city's "cooling off" period, and Jafari took several steps to hide his payments to her. (Doc. 167 at 208). In a meeting with the new commissioner, Jafari "denied that Jo Ann Macrina had been working for him," and he thereafter sent two letters denying that he hired Macrina. (*Id.* at 214–18). Moreover, Jafari instructed one of his employees to lie and claim

that "you haven't seen her" if anyone asked about Macrina's presence in his company's office. (Doc. 168 at 191).

In addition to the repeated promises to hire Macrina, Jafari gave her gifts in April and May 2016 while she was still Commissioner of the Department of Watershed Management, including:

- A luxury hotel room in Dubai when Macrina was speaking at a water conference in the United Arab Emirates, (Doc. 170 at 14–15, 20);

- A diamond ring, luggage, and bedding purchased in a shopping spree during the United Arab Emirates trip, (*id.* at 21–23, 27, 31);[2]

- $10,000 in cash for the United Arab Emirates trip, (*id.* at 153); and

- Over $1,000 worth of landscaping at Macrina's home, (*id.* at 123–24, 127–28, 130).

_____

[2] Ferra Cummings, an employee at Jafari's company, made these purchases after Jafari instructed her to "take good care of" Macrina and "make her happy" during the trip. (Doc. 170 at 15). Jafari later instructed Cummings to lie about these purchases if questioned by federal agents. (*Id.* at 33–34).

Jabu Sengova, the City of Atlanta's Ethics Officer, testified regarding the city's Code of Ethics.[3] (Doc. 169 at 216). The Code of Ethics prohibited city employees from participating in any contract in which they have a personal financial interest or from accepting anything of value "calculated to influence a vote decision or the exercise of official authority in any manner involving the city." (*Id.* at 224–25). In addition, Macrina signed an ethics pledge attesting that she would not accept a thing of value from a city contractor or other "prohibited" sources, participate in "any matter in which [she had] a financial or personal interest," or "disclose any confidential information that [she] learned in [her] official capacity." (*Id.* at 231–32).

The Code of Ethics also required certain city officials to make financial disclosures regarding outside businesses and sources of income. (*Id.* at 227–28). City officials are required to file the financial disclosure statements "one last time . . . for the year after" leaving their employment with the city. (*Id.* at 228). She noted that the Code of Ethics included a one-year "cooling off period" in which former city employees are prohibited from being involved in anything they

---

[3] Macrina filed a motion *in limine* to exclude this testimony, (Doc. 80), and renewed her objection at trial, (Doc. 169 at 222), both of which the court denied. (Doc. 99; Doc. 169 at 222).

worked on while employed by the city. (*Id.* at 223, 233–34). Macrina filed a financial disclosure form after the city fired her, which failed to disclose her work for, or any money received from, Jafari in 2016. (*Id.* at 237–38). Macrina also filed a travel disclosure form in May 2016 that disclosed her official travel to Abu Dhabi in April 2016, but her signed form failed to report anything received from Jafari or Ferra Cummings during this trip. (*Id.* at 240–41).

FBI Special Agents Brian Davis and Christy Parker testified that Macrina contacted the FBI the day after her firing to "provide information of possible corruption" at the City of Atlanta. (Doc. 170 at 139–40). During that initial meeting, and in approximately five additional meetings with the FBI in 2016, Macrina provided information about alleged corruption in city government, but she never mentioned Jafari. (*Id.* at 140–41, 233). In February 2017, the FBI asked her about Jafari, and Macrina admitted that she met with Jafari and the Chief Procurement Officer for the City of Atlanta, Adam Smith, to discuss the A&E evaluation process and "how to get the preferred vendors at the top of the list." (*Id.* at 142). Macrina identified Jafari's company as one of the "preferred vendors." (*Id.* at 235). Although Macrina admitted that she came up with the idea to request oral interviews for the A&E evaluation "[t]o make sure the preferred vendors came in the top six," (*id.* at 152, 242–43), she

13

repeatedly denied receiving anything of value from Jafari. (*Id.* at 144, 148, 237–38).

After nearly twenty FBI interviews, (*id.* at 237), Macrina finally confessed in a February 2019 interview that she received $10,000 in cash, landscaping, and other items from Jafari. (*Id.* at 153, 244–45). Macrina stated that Jafari had instructed Cummings "to buy whatever Jo Ann Macrina wanted" during her trip to the United Arab Emirates, including a diamond ring, and gave her $10,000 to "buy whatever she wished with it" before her United Arab Emirates trip. (*Id.* at 154, 156). And she admitted that while she was commissioner, Jafari promised to hire her in a top-level position at his company. (Doc. 170 at 154, 239–40, 245, 248). Specifically, between 2014 and 2016, Jafari "repeatedly offered her to take over PRAD." (*Id.*).

### 2. Macrina's recorded statement

In March 2019, Macrina met with the FBI a final time. (Doc. 170 at 158). During that meeting, she "started backtracking" on her admission about Jafari's cash gift and claimed the $10,000 payment was a "signing bonus" from Jafari. (*Id.* at 159). Because her "story had changed from February to March," the FBI agents secretly recorded the latter portion of the March 2019 interview. (*Id.* at 160, 192).

On September 20, 2022, the government informed defense counsel that it planned to introduce designated portions of the

recording of the March 2019 interview in its case-in-chief. (Doc. 105 at 2). The day after jury selection, Macrina filed a motion to admit additional statements from her March interview, which she claimed was justified under Federal Rule of Evidence 106. (*Id.* at 1). Macrina did not provide the district court with her specific proposed additional statements but instead stated that defense counsel "can provide" the portions Macrina requested to be played. (*Id.* at 1 n.1). The district court denied Macrina's motion, noting the general prohibition on offering self-serving statements as hearsay and her failure to cite any authority applying the rule of completeness to pre-detention statements. (Doc. 109 at 5–6).

At trial, Agent Davis testified about a series of audio clips from the recorded portion of the March 2019 interview. (Doc. 170 at 161–68). The district court admitted ten audio clips from the March 2019 over the objection of Macrina's attorney. (*Id.* at 161). Yet again, Macrina did not identify for the district court the select portions of the recorded interview that she believed should be admitted with the government's clips. (*Id.*)

In the clips admitted into evidence, Macrina stated that:

- Jafari gave her "several thousand" in cash, not $10,000, and "it wasn't for me. I brought . . . several thousand of my own." (Ex. 18A; Doc. 170 at 162).

15

- Jafari gave her a "couple of thousand" dollars and "asked [her] to buy some things for his wife," and Macrina brought about $3,000 of her own money. (Ex. 18B; Doc. 170 at 163).

- She did not remember how much Jafari gave her, but it was perhaps "three, four thousand" dollars, in addition to $3,000 of her own money and $1,500 from the City of Atlanta. (Ex. 18D; Doc. 170 at 163–64).

- Jafari gave her the cash in hundred-dollar bills, and the total amount "couldn't have been any more than 5,000." (Ex. 18E; Doc. 170 at 165).

Two days after the March 2019 interview, Macrina sent Agent Parker a text stating, "He offered 10,000 verbally. I can't confirm what he actually had. After discussion he gave me 5,000 for gifts. Said he'd give me a remainder after that . . . but when he did it was less than 5,000." (Doc. 170 at 251).

In addition to her shifting recollections of the amount of cash that Jafari gave her, (*id.* at 219–20, 249), Macrina offered multiple explanations for how the cash was spent. On one hand, Macrina claimed that Jafari "wanted [her] to get stuff for his wife," she thereafter bought "his wife stuff that [she] gave him," and "I bought his wife stuff that I gave him. I don't have it. . . . I gave him the stuff."

16

(Exs. 18D & 18G; Doc. 170 at 163–64). On the other hand, Macrina admitted that Jafari "told [her she] could spend it on—on anything [she] wanted as well," and she spent some of Jafari's money on gifts for her friends and family. (*Id.*). On cross-examination, Macrina's counsel asked Agent Davis again whether Macrina stated in the March 2019 interview that Jafari gave her money to "buy some things for his wife," which Agent Davis confirmed. (*Id.* at 215–16, 218).

After Agent Davis asked Macrina why she had not disclosed Jafari's gifts when the FBI had previously asked whether she had taken anything of value, Macrina responded, "I wish I had." (Ex. 18H; Doc. 170 at 168). Macrina admitted that she had not told any city employee that "Jafari was trying to give [her] things or had given [her] things." (Ex. 18I; Doc. 170 at 168).

At no point during trial did Macrina identify for the district court the specific excerpts of the March 2019 recording that she sought to admit. On November 16, 2022, approximately a month after the jury verdict, Macrina filed an amended motion to supplement the record with her requested excerpts of the recording, which the district court granted. (Docs. 134, 144).

### 3. Jury instructions

During the charge conference, counsel for Macrina requested a jury instruction on the ethics code evidence. (Doc. 171 at 108). The

17

district court modified Macrina's suggested instruction and proposed telling the jury, "[t]hroughout this trial, you've heard evidence about various City of Atlanta ethics rules," and then instructing the jury as follows:

> This is a federal trial. And Ms. Macrina is not on trial for violating any city ethics rules. Ms. Macrina is only on trial for violating the federal laws I explained to you. Ms. Macrina can only be convicted of violating those federal laws [] if you agree that the government has proved beyond a reasonable doubt each and every element of those federal laws.

(*Id.* at 110). The government did not object to the proposed instruction, and Macrina's counsel stated, "Okay. We can live with that." (*Id.*). The district court instructed the jury consistent with this agreed-upon proposal. (*Id.* at 208).

Macrina also proposed the following jury instruction regarding Section 666:

> The law does not prohibit a public official accepting or agreeing to accept a thing of value after performing government business, a government transaction, or a series of government transactions. If you find the Defendant accepted or agreed to accept anything of thing of value after performing government business, a government transaction, or a series of government transactions, then you cannot rely on that thing of value as a basis to find the Defendant violated the law.

18

(Doc. 94 at 25). The government argued that this instruction was improper under *United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010) and that it stated an "incorrect legal principle" by suggesting that "if a pledge is made while someone is a City employee, but they ultimately receive the [thing of value] after they leave office, that . . . means that there is no bribe." (Doc. 171 at 124). The district court concluded, "I may be misinterpreting *McNair*, but I don't think the Eleventh Circuit—I'm not going to charge it." (*Id.* at 125). The district court read to the jury the pattern jury instruction for bribery under Section 666. (*Id.* at 203–07).

### C. Standard of Review

1. & 2. District courts have "considerable leeway" in evidentiary rulings, which are reviewed for abuse of discretion. *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018).

3. A district court's refusal to give a jury instruction is reviewed for abuse of discretion. *United States v. Ndiaye*, 434 F.3d 1270, 1280 (11th Cir. 2006).

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in excluding Macrina's proposed excerpts of her own recorded statements from March 2019 under Federal Rule of Evidence 106. Macrina did not comply with Rule 106 because she failed to identify for the district court the specific excerpts she sought to admit at the time of the recording's admission, and even if she had, no Eleventh Circuit authority has applied Rule 106 in the context of non-custodial statements to overcome the general prohibition on self-serving hearsay. In any event, her proposed excerpts on cash paid by Jafari were cumulative of admitted portions of her recorded statement and were thus not necessary to explain the introduced portions. Any possible error in excluding this evidence was harmless given the extensive evidence of multiple bribes paid to Macrina aside from cash.

The district court properly admitted evidence of portions of the City of Atlanta Code of Ethics that set forth the standards of conduct for Macrina's position. This evidence contextualized and underscored her glaring departures from those standards of conduct to favor Jafari, which were probative of her corrupt intent. The district court's limiting instruction for this evidence mitigated any risk of juror confusion, as did both parties' statements to the jury in closing arguments that Macrina was not on trial for Code of Ethics violations.

20

And Macrina cannot prove a substantial prejudicial effect from the admission of this evidence when ample other evidence established her corrupt intent.

Finally, the district court did not abuse its discretion in denying Macrina's proposed jury instruction on 18 U.S.C. § 666, which misstated the law recognizing that acceptance of benefits after government action was undertaken to benefit the bribe payer can violate Section 666. Macrina's defense was not hindered by the omission of her proposed instruction because the jury was properly instructed on the government's burden to prove her corrupt intent, and defense counsel argued that she lacked corrupt intent based on the timing of bribe payments throughout closing argument.

## ARGUMENT AND CITATIONS OF AUTHORITY

1. **The district court did not abuse its discretion in excluding self-serving hearsay from Macrina's non-custodial recorded statements when admitted portions of the recording did not distort the meaning of her statements or exclude exculpatory information.**

   A. **Neither the plain language of Federal Rule of Evidence 106 nor Eleventh Circuit authority required the admission of Macrina's pre-arrest statements when Macrina failed to proffer the specific portions of her self-serving hearsay she sought to introduce until after trial.**

Macrina contends that the district court abused its discretion in excluding additional statements from the recorded portion of her March 2019 interview, which she claims was contrary to the plain language of Federal Rule of Evidence 106 and Eleventh Circuit precedent. But Macrina failed to comply with the plain language of Rule 106 by not identifying the specific portions of the recording she sought to introduce "at that time" the government admitted its excerpts. Fed. R. Evid. 106. And, as the district court found, Macrina cannot point to any Eleventh Circuit authority that applied the rule of completeness to a non-custodial statement akin to her March 2019 interview.

Macrina did not present the district court with the specific portions of the March 2019 recording that she believed, "in fairness,"

22

should be considered with the government's audio clips, and she accordingly failed to comply with Federal Rule of Evidence 106. Rule 106 states:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, **at that time**, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time.

Fed. R. Evid. 106 (emphasis added). By its plain language, a party seeking admission of additional portions of a statement must identify them "at th[e] time" the other party first introduces the statement. In *United States v. Umbach*, 708 F. App'x 533, 549 (11th Cir. 2017), this Court rejected a rule of completeness challenge when, after the government played excerpts of his recorded statements, the defendant only raised a generalized claim that the jury should have been permitted to hear his explanations for his conduct. The Court held that the defendant "has not properly preserved this argument for appellate review because he failed to identify his select portions of the interview for the district court." *Id.*; *see also United States v. Larranaga*, 787 F.2d 489, 500 (10th Cir. 1986) (rejecting rule of completeness claim when defendant "did not follow the procedure outlined in rule 106 'at that time'" when the government first introduced excerpts from the statement); *United States v. King*, 351 F.3d 859, 866 (8th Cir.

2003) (noting that to raise a Rule 106 objection, "the party urging admission of an excluded conversation must specify the portion of the testimony that is relevant to the issue at trial and that qualifies or explains portions already admitted") (quotation marks omitted).

The same is true here. Macrina failed to specify the portions of her statement that she sought to admit at any point before or during trial, much less "at th[e] time" the government introduced portions of her recorded statement. Fed. R. Evid. 106. Before trial, her motion in limine stated only that she sought to admit "certain statements" from the March 2019 recording and noted that counsel "can provide the Court . . . what Ms. Macrina has requested be played as well under Fed. R. Evid. 106." (Doc. 105 at 1 & n.1). But Macrina did not do so. And "at that time" the government introduced its excerpts of the recorded statement in trial, counsel for Macrina only adopted her prior objections. (Doc. 170 at 161). Macrina did not identify for the district court the portions of her statement that "in fairness ought to be considered at the same time" until weeks after trial. (Doc. 134).

Without the benefit of seeing the specific portions of the March 2019 recording that Macrina sought to admit, the district court recognized the general principle that "defendant may not introduce his own exculpatory statement through another witness without subjecting himself to cross-examination." *United States v. Vernon*, 593

24

F. App'x 883, 890 (11th Cir. 2014) (citing *United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999)); (Doc 109 at 5–7). Macrina does not dispute that she sought to admit self-serving hearsay from her recorded statement, but instead suggests that Rule 106 "renders otherwise inadmissible evidence admissible." App. Br. at 23. Although Macrina cites out-of-circuit authority that reached that conclusion, *id.* at 24, she ignores other courts that held the opposite in concluding that "Rule 106 addresses only an order of proof problem and does not make admissible what is otherwise inadmissible." *United States v. Pendas-Martinez*, 845 F.2d 938, 944 n.10 (11th Cir. 1988) (citing cases); *see also United States v. Holden*, 557 F.3d 698, 706 (6th Cir. 2009) (holding that Rule 106 error was harmless when portions defendant sought to admit were "inadmissible hearsay and were properly excluded"). This Court has recognized the circuit split on this issue, but has not directly addressed whether the rule of completeness permits the introduction of otherwise inadmissible hearsay. *See Pendas-Martinez*, 845 F.2d at 944 n.10.

In light of the general prohibition on the introduction of self-serving hearsay, the district court noted that this Court has only narrowly applied the rule of completeness in the context of a defendant's custodial statements. (Doc. 109 at 5–6). Specifically, this Court "has extended the rule to the exculpatory portions of a criminal

defendant's *post-arrest* oral statements." *United States v. Santos*, 947 F.3d 711, 729–30 (11th Cir. 2020) (emphasis added); *see, e.g.*, *United States v. Baker*, 432 F.3d 1189, 1222–23 (11th Cir. 2005) (applying Rule 106 to exculpatory portions of defendant's "post-arrest statements"); *United States v. Range*, 94 F.3d 614, 620–21 (11th Cir. 1996) (analyzing rule of completeness in context of defendant's post-arrest statements).[4]

Although Macrina contends that Eleventh Circuit authority does not expressly state that "Rule 106 applies to post-detainment statements" only, App. Br. at 22, there is also no Eleventh Circuit authority applying Rule 106 to a non-custodial or non-detention context in criminal cases. The district court gave Macrina multiple opportunities to identify case law that applied the rule of completeness to a non-custodial statement, (Doc. 169 at 934; Doc. 172 at 28–29), but Macrina provided no binding authority to the

---

[4] Macrina correctly notes that the district court also cited the opinion in *United States v. Pacquette*, 557 F. App'x 933, 935–38 (11th Cir. 2014), which "does not say that the defendant was detained before making the statements at issue." App. Br. at 23. Although the *Pacquette* Court did not conduct an analysis of whether the defendant's statements were custodial, the relevant statements arose from the defendant's interrogation by federal agents in an inspection area after they stopped the defendant disembarking from an international flight. 557 F. App'x at 935.

court. And the Supreme Court has long recognized that custodial statements differ from non-custodial statements, holding that custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely" if "proper safeguards" are not in place. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). Accordingly, Macrina cannot demonstrate that precedent in the context of custodial statements necessarily guides the interpretation of Rule 106 for self-serving, non-custodial statements like those offered in her March 2019 interview.

Given the unsettled law in this circuit on whether Rule 106 renders otherwise inadmissible hearsay admissible and whether it does so in a non-custodial context, Macrina cannot establish that the district court's exclusion of her self-serving hearsay was "manifestly erroneous." *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018). Moreover, based on Macrina's failure to satisfy the standards for the introduction of statements under Rule 106, as discussed below, this Court should decline to extend the rule of completeness based on the facts presented here.

27

**B. Even if the rule of completeness applied to non-custodial statements, Macrina's proffered additional statements were not necessary to correct any distortion in, or explain, the government's admitted excerpts from her recording.**

Even if the rule of completeness applied to non-custodial statements and permitted the admission of otherwise improper self-serving hearsay, and even if Macrina had properly preserved her objection by identifying for the district court the specific excerpts she sought to admit, the exclusion of her additional excerpts was not an abuse of discretion because Macrina cannot establish that the government's admitted excerpts were misleading or required further context. To admit a statement under Rule 106, the defendant must show that her additional offered statements are "relevant and . . . necessary to qualify, explain, or place into context the portion already introduced." *United States v. Simms*, 385 F.3d 1347, 1359 (11th Cir. 2004); *see also United States v. Branch*, 91 F.3d 699, 727 (5th Cir. 1996) ("[The purpose of Rule 106] is to permit the contemporaneous introduction of recorded statements that place in context other writings admitted into evidence which, viewed alone, may be misleading.") (quotation marks omitted); *United States v. LeFevour*, 798 F.2d 977, 981 (7th Cir. 1986) (recognizing purpose of rule of completeness to "make sure that a misleading impression created by taking matters out of context is corrected on the spot"); *United States v.*

*Costner*, 684 F.2d 370, 373 (6th Cir. 1982) ("Rule 106 is intended to eliminate the misleading impression created by taking a statement out of context."). In sum, Rule 106 applies only to relevant material that explains or clarifies already admitted evidence, which would otherwise be substantively misleading or false. *Simms*, 385 F.3d at 1359.

Here, Macrina's requested additional excerpts were cumulative of the government's excerpts admitted in evidence, and Macrina thus cannot establish either that the government's excerpts were misleading or that her excerpts were "necessary to qualify, explain, or place into context" the government's excerpts. *Id.* Macrina bases her Rule 106 claim on five excerpts that the jury purportedly "did not hear," all of which are focused on the use of the cash that Jafari indisputably gave to Macrina before her United Arab Emirates trip. App. Br. at 26–27.

First, Macrina claims that the jury "never heard Ms. Macrina deny using Jafari's cash to buy goods for herself," App. Br. at 27–28, but the government introduced nearly an identical excerpt. Specifically, Exhibit 18A included Macrina's statement that Jafari gave her cash, but "it wasn't for me. I brought . . . several thousand of my own." The government also introduced multiple statements from Macrina that she used Jafari's cash to buy gifts for his wife, not for herself, as described below.

29

Second, Macrina argues that the jury "never heard Ms. Macrina deny keeping any of Jafari's cash." App. Br. at 28. But the government again introduced an excerpt nearly identical to the purported "missing" statement. Specifically, Exhibit 18D contained Macrina's statements that she used Jafari's cash to buy "his wife stuff that I gave him," and that she "spent pretty much—it was close to all of" Jafari's cash.

Third, Macrina contends that the jury did not hear her claim that she "bought stuff for myself with my own money." App. Br. at 28. But the government introduced multiple statements from Macrina that Jafari's money "wasn't for me" and that she instead "brought . . . several thousand of my own." (Ex. 18A; *see also* Ex. 18B (quoting Macrina stating that she brought "about three thousand of my own"); Ex. 18D (quoting Macrina stating she "had about 3,000 of my own money")).

Fourth, Macrina argues that the jury did not hear her deny "taking the cash for me," App. Br. at 28, but the government's admitted excerpts are replete with similar denials from Macrina. (*See* Ex. 18A ("I don't remember how much it was. It wasn't 10,000 that I remember . . . it was several thousand, but **it wasn't for me.**"); Ex. 18B ("**He asked me to buy some things for his wife** . . . . So he did give me a couple of thousand. Two or three thousand."); Ex. 18D ("[H]e wanted

me to get stuff for his wife" and "I bought his wife stuff that I gave him")) (emphasis added). Moreover, on cross-examination, Macrina elicited testimony from Agent Davis confirming that Macrina stated in her March 2019 interview that Jafari gave her money to "buy some things for his wife." (Doc. 170 at 215–16, 218).

Fifth, Macrina claims that the jury did not hear her state that she gave Jafari all the items that she purchased with Jafari's money for his wife. App. Br. at 28. Yet again, the admitted excerpts already covered this claim. (*See* Ex. 18D ("I bought his wife stuff that I gave him. I don't have it. . . . I gave him the stuff.")); Ex. 18G ("And I did bring him back stuff. . . . And I gave it to him.")).

Because the government's admitted excerpts included substantively identical statements to those Macrina sought to introduce, she cannot establish that her proposed excerpts were "relevant and necessary to harmonize the introduced portion." *Pendas-Martinez*, 845 F.2d at 945; *see also United States v. Johnson*, 579 F. App'x 867, 870 (11th Cir. 2014) (holding that "Rule 106 challenge misses the mark" when defendant failed to identify any portion of admitted recording "that was misleading or distorted in isolation" and admitted portions "already established" points defendant sought to clarify). Rule 106 establishes a rule of completeness, not a rule of cumulativeness. *See United States v. Lewis*, 919 F.2d 146 (9th Cir. 1990) (denying defendant's Rule 106

31

challenge when admitted portions of statement already "provide[d] the context" for defendant's admission, and "excluded portions on the same subject would have been cumulative, and were not necessary to avoid misleading the jury"). Additional statements by Macrina concerning how she used Jafari's cash are at best cumulative of the testimony already presented at trial and are at worst inculpatory by further highlighting her shifting, implausible explanations for this cash.

### C. Any error in the exclusion of portions of Macrina's recorded statements was harmless given the overwhelming evidence of her receipt of things of value from Jafari.

Furthermore, any purported error was harmless considering the overwhelming evidence against Macrina. *See Baker*, 432 F.3d at 1229, 1259 (concluding that the erroneous exclusion of defendant's exculpatory statements under the rule of completeness was harmless and affirming his conviction); *United States v. Jeri*, 869 F.3d 1247, 1262 (11th Cir. 2017) (noting that even assuming excluded transcripts were admissible under Rule 106, "their exclusion was harmless" based on a "strong evidential, if circumstantial, foundation" that defendant knew he was transporting cocaine). For erroneous evidentiary rulings, "even an abuse of discretion will not warrant reversal where the resulting error was harmless," which requires the defendant to show a "substantial prejudicial effect" from the ruling. *Barton*, 909 F.3d at

32

1330–31 (quotation marks omitted). "Substantial prejudice goes to the outcome of the trial; where . . . sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *Id.* at 1331 (quotation marks omitted).

Macrina's proposed additional excerpts focus solely on the cash Jafari gave her before her trip, but ample evidence aside from the March 2019 interview supported this cash payment. First, Agent Davis testified that Macrina stated in her prior interview in February 2019 that "she had received $10,000 in cash when she went to Abu Dhabi" and that Jafari "told her she could buy whatever she wished with it." (Doc. 170 at 153, 156). Second, Macrina sent Agent Parker a text message two days after the March 2019 meeting stating that Jafari "offered 10,000 verbally. . . . After discussion he gave me 5,000 for gifts. Said he'd give me a remainder after that . . . but when he did it was less than 5,000." (*Id.* at 251). Third, Agent Davis testified that Jafari's bank records showed a $10,000 cash withdrawal from his account on April 15, 2016, the day before Macrina left for Abu Dhabi. (*Id.* at 156; Ex. 30D). Fourth, Macrina filed a City of Atlanta travel disclosure form for her United Arab Emirates trip, but she failed to disclose anything received from Jafari during this trip, (Doc. 169 at 240–41), which was probative of her intent to hide cash received from Jafari. Accordingly, sufficient evidence established that

Jafari gave Macrina cash for illicit purposes, even leaving aside the admitted portions of her March 2019 recorded statement.

Macrina also cannot establish that the exclusion of her selected excerpts had a "substantial prejudicial effect" because the government presented extensive evidence of benefits Jafari provided her aside from cash, including a luxury hotel room, a diamond ring, luggage, bedding, and approximately $1,000 in landscaping. (Doc. 170 at 14–15, 20–23, 27, 31, 123–24, 127–28, 130). Multiple witnesses also testified that between 2014 and 2016, Jafari repeatedly offered Macrina, while she was commissioner, a position at his company, which he ultimately wanted her to take over in a leadership role. (Doc. 169 at 24–25, 175; Doc. 170 at 154, 239–40, 245). Since Macrina sought the admission of self-serving hearsay that related to only one of a multitude of benefits Jafari gave her, any error would be harmless because "sufficient evidence uninfected by error supports the verdict." *Barton*, 909 F.3d at 1331.[5]

---

[5] Macrina cites *United States v. Fattah*, 914 F.3d 112, 154 (3d Cir. 2019) for the proposition that an error is not harmless if the Court "cannot isolate the jury's consideration" of cash from other bribes, App. Br. 31–32, but the Third Circuit opinion in *Fattah* provides no guidance here. First, the court in *Fatteh* addressed erroneous jury instructions, not the alleged erroneous admission of evidence, and concluded that the error was not harmless because two-thirds of the "official acts" alleged in the indictment were not unlawful. *Id.* Second, the defendant in *United States v. Roberson*, 998 F.3d 1237, 1252 (11th

34

**2. The district court did not abuse its discretion in admitting evidence relating to Macrina's violations of the City of Atlanta's Code of Ethics, which was probative of her corrupt intent to give Jafari preferential treatment and not unduly prejudicial.**

Macrina contends that evidence she repeatedly flouted City of Atlanta ethics rules to favor Jafari is not relevant to her bribery charges and, even if it were, the risk of unfair prejudice and juror confusion substantially outweighed its probative value. App. Br. at 32–43. Macrina's argument ignores precedent recognizing that evidence of a defendant's violations of rules or statutes evinces corrupt intent, and the limiting instruction requested by Macrina mitigated any risk of unfair prejudice and juror confusion. Macrina thus cannot establish that the district court abused its discretion in admitting this evidence, and any error was harmless given the substantial evidence of her corrupt intent.

_____

Cir. 2021) made a nearly identical argument to the appellant in *Fatteh*—that "a single official act, coupled with non-official acts and inadequate instructions, requires a new trial." This Court reached the opposite conclusion from *Fatteh*, noting that "a conviction must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Ignasiak*, 667 F.3d 1217, 1228 (11th Cir. 2012)); *see also United States v. Neder*, 197 F.3d 1122, 1129 (11th Cir. 1999) ("Under harmless-error analysis, the Government also is not required to prove that the evidence overwhelmingly supports the materiality of *every* falsehood alleged for each mail, wire, or bank fraud count.").

35

### A. Evidence of relevant provisions of the Code of Ethics was probative of Macrina's intent to benefit Jafari because of his bribes.

As a general matter, under the Federal Rules of Evidence, all "relevant evidence is admissible." Fed. R. Evid. 402. The standard for what constitutes "relevant evidence" is a "low one." *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002); *see also United States v. Long*, 574 F.2d 761, 765 n.11 (3d Cir. 1978). Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401.

Evidence regarding specific City of Atlanta Code of Ethics rules implicated by the charged bribery conduct clears the "low bar" for relevant evidence. *Tinoco*, 304 F.3d at 1120. This Court has previously held that evidence of official rules and regulations governing conduct for public officials is admissible to prove corrupt intent in bribery cases. *See United States v. Fernandez*, No-19-15044 & 19-15165, 2022 WL 3581793, at *5–6 (11th Cir. Aug. 22, 2022). In *Fernandez*, an FAA inspector faced bribery charges under 18 U.S.C. § 201(b)(2)(C) for accepting salary from an entity subject to inspection by the FAA, and the government at trial presented evidence that FAA regulations prohibit inspectors from accepting such outside employment. *Id.* at *1. The defendant challenged the admission of evidence relating to FAA rules and regulations, and the Court held that the evidence of FAA rules "supports the jury's conclusion that [defendant] accepted bribes

36

in exchange for violating his official duties, including, . . . salary from a private source." *Id.* at \*6. And the Court rejected the defendant's contention that the "government's reliance on these rules and regulations might have led the jury to convict him of civil rather than criminal offenses," noting that the government did not "explicitly urge[] the jury to convict him solely based on violations of rules or regulations" and that the court's cautionary instruction "presumptively cured any potential confusion." *Id.* at \*5.

Similarly, in *United States v. Jackson*, 688 F. App'x 685, 693 (11th Cir. 2017), this Court considered evidence that a police chief acted contrary to state law in weighing the sufficiency of the evidence for his Section 666 conviction. In return for six payments, the police chief gave official law enforcement credentials to the bribe payer providing "all the indicia of a lawfully appointed Florida law enforcement officer" and "therefore appointed (and held out)" the bribe payer as a law enforcement officer. *Id.* The Court noted that Florida law required a Commissioner's certification to serve as a law enforcement officer, and the defendant's appointment of the bribe payer thus violated state law. *Id.* (citing Fla. Stat. §§ 943.12(3), 943.1395(1)). The Court held that the defendant's action in contravention of state law "supports the jury's finding that [defendant] acted with a corrupt intent" by giving the bribe payer preferential treatment "using illegal means" under state law. *Id.*; *see also United States v. Salesman*, 467 F. App'x 835, 844 (11th Cir. 2012) (concluding that sufficient evidence

37

supported city official's "corrupt intent" in bribery convictions under 18 U.S.C. § 666 when defendant stated he had to be "very careful" about assisting construction company seeking to obtain city contracts given "state law prohibiting kickback[s]" (quotation marks omitted)); *United States v. Grubb*, 11 F.3d 426, 432–33 (4th Cir. 1993) (rejecting evidentiary challenge to the admission of the state Code of Judicial Ethics as irrelevant and prejudicial under Rule 402 and Rule 403, holding that the judge's knowledge of the judicial canons were relevant to show his corrupt intent and absence of mistake in 18 U.S.C. § 666 bribery case).

The same is true here. The jury heard evidence that the City of Atlanta Code of Ethics prohibited city employees from (1) participating in any matter in which they have a personal or financial interest, (2) accepting a thing of value from a city contractor or other prohibited source, or (3) disclosing confidential information learned in their jobs. (Doc. 169 at 224–25, 231–32). Yet the evidence showed that Macrina did each of these things in giving Jafari preferential treatment in city contracts. For example, during the same period between 2014 and 2016 that Jafari repeatedly offered Macrina a top-level position at his company, Macrina not only requested changes to the A&E contract selection process that benefited Jafari, but also directly participated in the selection as an "outspoken" advocate for Jafari's company during the collaborative scoring process. (Doc. 168 at 43, 54–57, 94–97, 99–100; Doc. 169 at 23–24, 111–14, 139).

38

Macrina also directly communicated with Jafari about the upcoming interviews for the A&E contract in violation of the city's "blackout" rules prohibiting such contact. (Doc. 167 at 64, 69–70; Doc. 169 at 172–73). Based on evidence of the expected norms of conduct for Macrina's commissioner role, and her significant departures therefrom to favor Jafari, the jury could reasonably infer that Macrina knowingly sought to accomplish an unlawful end in return for the multitude of benefits received from Jafari.

Relatedly, evidence that Macrina had an obligation to list salary and benefits received from Jafari on City of Atlanta financial disclosure forms, and that she failed to do so, was probative of her intent to hide such benefits. (Doc. 169 at 227–28, 237–38, 240–41). "The corrupt usually don't advertise their corrupt ways, or as we noted in *McNair*, 'the extent to which the parties . . . conceal their bribes is powerful evidence of their corrupt intent.'" *United States v. White*, 663 F.3d 1207, 1214 (11th Cir. 2011) (quoting *McNair*, 605 F.3d at 1197) (holding that sufficient evidence supported Section 666 conviction, based on evidence that county officials had to report outside employment and benefits received, when commission president failed to report cash received from bribe payer); *see also United States v. Roberson*, 998 F.3d 1237, 1249 (11th Cir. 2021) (holding that, among other evidence, "nondisclosure of the [bribe] payments" and "the failure of the parties to inform [federal agencies] of their financial relationship support the inference that the payments were made with

a corrupt state of mind"). Testimony establishing Macrina's obligation to disclose the salary and benefits Jafari gave to her was necessary to explain her concealment of those things of value, which the jury could reasonably infer showed her corrupt intent. In short, the Code of Ethics evidence was highly probative of Macrina's corrupt intent by contextualizing her unlawful decisions that gave preferential treatment to Jafari and her intentional concealment of it.

In contesting the relevance of this evidence, Macrina cites out-of-circuit authority where defendants sought to introduce evidence of their compliance with state law, which the courts deemed not relevant to federal criminal charges.[6] *See United States v. Lupton*, 620 F.3d 790, 799–800 (7th Cir. 2010) (affirming exclusion of defense legal expert because defendant's adherence to state law had "limited value" in disproving that he violated federal law); *United States v. Stewart*, 433

_____

[6] Macrina's other cited authorities either excluded defense evidence that did not relate to bribery charges at issue or did not address the exclusion of evidence at all. *See United States v. Urciuoli*, 613 F.3d 11, 15–16 (1st Cir. 2010) (rejecting defendant's requested jury instruction on state law, but not excluding evidence of a state law and state ethics commission opinion); *United States v. Terry*, No. 1:10-CR-390, 2011 WL 2149361, at *4 (N.D. Ohio May 31, 2011) (excluding judicial ethics code provision on *ex parte* communications as irrelevant to defendant's knowledge when there was no parallel to bribery charge at issue); *United States v. Silver*, No. 1:15-CR-00093, Doc. 56, at 25 (S.D.N.Y. Sept. 14, 2015) (seeking the exclusion of state ethics opinion on propriety of law firm employing defendant that did not discuss defendant's underlying conduct).

F.3d 273, 312 (2d Cir. 2006) (rejecting defense expert on defendant's compliance with securities laws as irrelevant to false statements prosecution); *United States v. Haymon*, No. 20-4438, 2021 WL 4495813, at *1 (4th Cir. Oct. 1, 2021) (holding that evidence of compliance with state drug laws did not provide a defense to alleged violations of contrary federal law); *United States v. Walsh*, 654 F. App'x 689, 696 (6th Cir. 2016) (same); *United States v. Wall*, No. 1:19-CR-00500, Doc. 220 (Apr. 28, 2022) (same); *United States v. Jenkins*, No. 14-CR-72, 2014 WL 12676280, at *4 (W.D. Mich. Aug. 20, 2014) (same); *United States v. Washington*, 887 F. Supp. 2d 1077, 1106 (D. Mont. 2012) (same). But cases holding that evidence of compliance with dissimilar state or local law is irrelevant to compliance with federal law does not mean that the inverse—that non-compliance with local rules is irrelevant to whether the defendant violated federal law—must also be true.

## B. The high probative value of Code of Ethics evidence was not substantially outweighed by the danger of unfair prejudice or jury confusion, particularly when the district court gave a limiting instruction to the jury.

Macrina also suggests that the Code of Ethics evidence should be excluded under Rule 403, which permits a district court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *see Tinoco*, 304 F.3d at 1120. Notably,

however, exclusion under Rule 403 "is an extraordinary remedy which the district court should invoke sparingly," as the Rule favors admissibility of probative evidence. *United States v. Elkins*, 885 F.2d 775, 784 (11th Cir. 1989). Indeed, "in a criminal trial relevant evidence is inherently prejudicial; it is only when *unfair* prejudice *substantially* outweighs probative value that the rule permits exclusion." *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983), *accord United States v. O'Sullivan*, 361 F. App'x 993, 998 (11th Cir. 2010). This Court defers to a district court's finding that the probative value of evidence was not outweighed by unfair prejudice. *United States v. Calhoon*, 97 F.3d 518, 533 (11th Cir. 1996).

The district court rejected Macrina's effort to exclude the Code of Ethics evidence pursuant to Rule 403, finding that the Code of Ethics was unlikely to confuse jurors about the federal charge and that a curative instruction could address any concern. (Doc. 99 at 6–7). Macrina contends that the evidence was unfairly prejudicial based merely on the number of witnesses who testified about the Code of Ethics, App. Br. at 36–39, but the defense's extensive cross-examination of Jabu Sengova and the district court's limiting instruction mitigated any risk of juror confusion.

Defense counsel conducted a lengthy cross examination of the City's Ethics Officer, Jabu Sengova, that highlighted the distinction between the Code of Ethics and the federal bribery charges against

Macrina. (Doc. 169 at 242–61). The government also made the distinction clear in its closing argument, stating, "just to be clear, Jo Ann Macrina is not on trial today for violating ethical rules. But those rules are relevant. They're relevant to her corrupt intent." (Doc. 171 at 149);[7] *see Fernandez*, 2022 WL 3581793, at *5 (concluding that there was no risk of unfair prejudice from evidence of FAA standards of conduct when the government did not "explicitly urge[] the jury to convict him solely based on violations of rules or regulations").

If there were still any risk of juror confusion or unfair prejudice, the district court cured it with a limiting instruction approved by the parties. At Macrina's request, the district court gave the jury a limiting instruction on ethics evidence that closely tracked her proposed instruction. (*Compare* Doc. 94 at 35 *with* Doc. 171 at 208). Specifically, the district court instructed the jury that Macrina was "not on trial for violating any City ethics rules," and that she could only be convicted of federal crimes if the government proved beyond a reasonable doubt each element of the federal offenses. (Doc. 171 at 208). Macrina indicated she could "live with that" and did not raise any objection. (*Id.* at 110). The court's limiting instruction was more than sufficient to mitigate any risk of confusion or unfair prejudice

---

[7] Defense counsel also distinguished ethics code violations from federal criminal cases in closing argument. (Doc. 171 at 176–77).

from the ethics evidence. *See Fernandez*, 2022 WL 3581793, at *5 (recognizing that the court's cautionary instruction "presumptively cured any potential confusion" from admission of evidence on FAA standards of conduct); *Grubb*, 11 F.3d at 433 (approving use of limiting jury instruction for evidence of judicial canons).[8]

Accordingly, Macrina cannot establish that unfair prejudice "substantially outweighed" the high probative value of the Code of Ethics evidence, and she thus cannot justify the "extraordinary remedy" she seeks by excluding the evidence under Rule 403. *Elkins*, 885 F.2d at 784.[9]

_____

[8] Macrina points to a juror note asking for a definition of an "unlawful act" to suggest that jurors must have been confused about the ethics evidence and that the curative instruction was insufficient. App. Br. 41–43. Not so. The jurors never asked about the ethics evidence, Macrina accepted the limiting instruction without objection, and one cryptic note does not overcome the presumption that "jurors follow the instructions given by the district court." *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011).

[9] Macrina cites several cases that reversed convictions under Rule 403, App. Br. at 40, but the evidence at issue in those cases was highly "inflammatory" and "likely to incite the jury to an irrational decision" because of its "graphic and arresting" content. *United States v. Hands*, 184 F.3d 1322, 1328–29 (11th Cir. 1999) (testimony and photographs of defendant's graphic spousal abuse); *see also United States v. Fawbush*, 634 F.3d 420, 422–23 (8th Cir. 2011) (testimony about defendant's sexual abuse of his daughters); *United States v. Fulmer*, 108 F.3d 1486, 1498 (1st Cir. 1997) (testimony about deaths from Oklahoma City bombing); *United States v. Ham*, 998 F.2d 1247,

### C. Any error from the admission of the Code of Ethics evidence was harmless given the extensive evidence of her corrupt intent.

Even if Macrina could establish that the district court abused its discretion in admitting Code of Ethics evidence, such error would be harmless because there was no "substantial prejudicial effect" from its admission and "sufficient evidence uninfected by error supports the verdict." *Barton*, 909 F.3d at 1330–31. Leaving aside the ethics evidence and financial disclosure forms, records of evaluator training for the A&E contract established that Macrina violated her expected duties in favoring Jafari, and her and Jafari's repeated efforts to conceal benefits paid to her showed her corrupt intent.

The training provided to Macrina when she selected herself to be on the A&E contract evaluation committee established that she understood her duties and repeatedly flouted them to provide preferential treatment to Jafari. Macrina's training instructed her that evaluators could not accept "anything of value from any person or entity that is a prospective proponent," "disclose any confidential information," have any "financial or personal interest" in any proponent, or "discuss the evaluation process . . . outside the

---

1252–53 (4th Cir. 1993) (evidence of child molestation and abuse of women). Evidence that Macrina breached provisions of a municipal code of ethics was unlikely to stir the jury's passions.

evaluation panel." (Doc. 167 at 106; Doc. 168 at 46–47). The jury heard extensive evidence of Macrina's receipt of things of value from Jafari and her personal financial interest in Jafari's company receiving the A&E contract because of his job offer. (Doc. 170 at 153–54, 156, 166, 239–40, 244–45, 248). In addition, Macrina spoke with Jafari about the upcoming interviews for the A&E contract and arranged for a rival engineer to participate in Jafari's interview to assist his proposal. (Doc. 169 at 23–24, 172–73).

Evidence of efforts to conceal Jafari's benefits also revealed her corrupt intent. *See McNair*, 605 F.3d at 1197 (noting that defendant's efforts to "conceal their bribes is powerful evidence of their corrupt intent"). In multiple interviews with the FBI before 2019, Macrina repeatedly denied receiving anything of value from Jafari. (Doc. 170 at 144, 148, 237–38). Her co-conspirator, Jafari, also instructed an employee to lie to the FBI if questioned about the benefits given to Macrina during the United Arab Emirates trip, instructed a different employee to lie about Macrina's work for the company, and repeatedly lied to the City of Atlanta regarding his hiring of Macrina. (*Id.* at 33–34; Doc. 167 at 214–18; Doc. 168 at 191).

Accordingly, in light of the sufficient evidence supporting her corrupt intent aside from the ethics evidence, any error in admitting such evidence was harmless. *Barton*, 909 F.3d at 1330.

46

**3. The district court did not abuse its discretion in denying Macrina's jury instruction on 18 U.S.C. § 666, which was contrary to binding Circuit precedent and misstated the law.**

Macrina contends that the district court erred by not instructing the jury that "[t]he law does not prohibit a public official accepting or agreeing to accept a thing of value after performing government business." (Doc. 94 at 25). But a party cannot provide legally inaccurate instructions to the jury. The district court enjoys broad discretion in formulating jury instructions that accurately reflect the law and facts. *See United States v. Maxwell*, 579 F.3d 1282, 1303 (11th Cir. 2009). A refusal to give a jury instruction is an abuse of discretion only if "(1) the instruction is correct; (2) the court did not address the substance of the instruction in its charge; and (3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense." *United States v. Ndiaye*, 434 F.3d 1270, 1293 (11th Cir. 2006).

Macrina's proposed jury instruction fails at the first step. On appeal, she miscasts her rejected jury instruction as an instruction on gratuities, but her actual proposed language sweeps more broadly and misstates the law set forth in her own cited authorities. By reading the pattern instruction for Section 666 to the jury, the district court did not "seriously impair" her ability to present an effective defense when

47

her closing argument focused on the timeline of benefits paid by Jafari and her lack of criminal intent, as instructed by the court. *Id.*

### A. Macrina's proposed instruction misstated the law by incorrectly suggesting that the receipt of benefits after conducting government business does not violate Section 666.

Macrina's proposed jury instruction is premised on two contentions: (1) that Section 666 only prohibits bribes, not gratuities, and (2) that her proposed language draws this legal distinction. Both premises are faulty.

Macrina urges this Court to conclude that Section 666 does not prohibit gratuities, tracking the reasoning of the First Circuit's opinion in *United States v. Fernandez*, 722 F.3d 1, 20–27 (1st Cir. 2013). App. Br. at 44–49. But Macrina does not acknowledge that the First Circuit's holding is in the minority among circuit courts that have considered the issue. *See Bravo-Fernandez v. United States*, 580 U.S. 5, 15–16 & n.4 (2016) (noting that First Circuit's holding that Section 666 "proscribes only *quid pro quo* bribes, and not gratuities," was "contrary to the rulings of most circuits to have addressed th[e] issue"); *United States v. Bahel*, 662 F.3d 610, 636 (2d Cir. 2011) ("Section 666 is broad enough to encompass an illegal gratuity theory of liability."); *United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015) ("Section 666 forbids taking gratuities as well as taking bribes."); *United States v. Zimmerman*, 509 F.3d 920, 927 (8th Cir.

2007) ("Section 666(a)(1)(B) prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action."); *see also United States v. Abbey*, 560 F.3d 513, 521 (6th Cir. 2009) (rejecting heightened "*quid pro quo*" requirement for Section 666 violations); *United States v. Garrido*, 713 F.3d 985, 1000–02 (9th Cir. 2010) (concluding that Section 666 does not require that a bribe be received, citing *McNair*). *But see United States v. Hamilton*, 46 F.4th 389, 396 (5th Cir. 2022) (acknowledging "lopsided split" among circuits concluding that Section 666(a) "criminalizes *both* bribery *and* illegal gratuities," but adopting First Circuit's reasoning in *Fernandez* to hold that Section 666(a) "applies only to *quid pro quo* bribery").[10]

In rejecting Macrina's proposed jury instruction, the district court referenced the Eleventh Circuit's opinion in *McNair*, (Doc. 171 at 125), which has been interpreted as holding that Section 666 "covers both bribery and illegal gratuities." *Hamilton*, 46 F.4th at 396. In *McNair*, the Eleventh Circuit recognized that Section 666 "sweeps more broadly than either Section 201(b) or (c)" and held that Section

---

[10] Macrina also cites *United States v. Jennings*, 160 F.3d 1006, 1015 (4th Cir. 1998) as establishing that Section 666 "does not cover gratuities," App. Br. at 44, but the *Jennings* Court expressly stated that it "need not decide today whether Section 666 also covers 'gratuities'" because sufficient evidence established that the defendant committed bribery.

666 does not require proof of a *quid pro quo*. *Id.* at 1188–89.

Accordingly, *McNair* arguably forecloses Macrina's contention that

Section 666 does not cover gratuities.

But this Court does not need to reexamine whether Section 666

covers gratuities because Macrina's proposed jury instruction misstates

the law under any interpretation of Section 666. Macrina requested

the following jury instruction, which the district court rejected:

> The law does not prohibit a public official *accepting* or agreeing
> to accept a thing of value after performing government
> business, a government transaction, or a series of government
> transactions. If you find the Defendant *accepted* or agreed to
> accept anything of thing of value after performing government
> business, a government transaction, or a series of government
> transactions, then you cannot rely on that thing of value as a
> basis to find the Defendant violated the law.

(Doc. 94 at 25) (emphasis added). Macrina's proposed language thus

would have instructed the jury that the "accept[ance]" of benefits after

government action does not violate Section 666. But even Macrina's

cited authorities recognize that the "*payment* of a bribe can occur after

the act that is the subject of the bribe is completed." *Fernandez*, 722

F.3d at 23; *see also United States v. Jackson*, 688 F. App'x 685, 694–95

(11th Cir. 2017) (holding that fact defendant accepted payments after

he took government action "is largely immaterial" because a "reward"

under Section 666 "can come after the business or transaction

50

occurred"); *United States v. Jennings*, 160 F.3d 1006, 1015 n.4 (4th Cir. 1998) (interpreting "reward" in Section 666 "to embody the established rule . . . that a bribe can be promised before, but paid after, the official's action on the payor's behalf"). If Macrina sought to distinguish bribes from gratuities, her proposed jury instruction needed to state that Section 666 does not prohibit an *agreement* to accept a thing of value formed after the government action. *Fernandez*, 722 F.3d at 19 ("[I]f the agreement to exchange a thing of value for an act is made after that act has been performed, that agreement cannot be properly viewed as an agreement to offer or accept a bribe."). Macrina instead proposed instructing the jury that "accepting or agreeing to accept" a thing of value after government action is not illegal, which misstates the law in the Eleventh Circuit and even the First Circuit in *Fernandez*.

Because Macrina's proposed jury instruction was not legally correct, the district court did not abuse its discretion in rejecting the instruction based on *McNair*. *See Ndiaye*, 434 F.3d at 1293. This Court should deny Macrina's contention on this basis alone.

**B. The omission of Macrina's proposed jury instruction did not seriously impair her defense when the government presented no argument that Macrina accepted gratuities.**

Even if Macrina's proposed instruction had not misstated the law, she cannot establish an abuse of discretion because the pattern

instruction provided to the jury did not seriously impair her defense for three reasons. *Id.*

First, the government never argued that Macrina violated Section 666 by receiving gratuities but instead repeatedly argued that she accepted bribes in exchange for steering City of Atlanta contracts to Jafari. (Doc. 167 at 18, 20, 24–25; Doc. 171 at 144, 157–58, 161–62). The government noted Macrina's receipt of cash, jewelry, a luxury hotel room, and other items in April 2016, but it identified Jafari's repeated promise to hire her from 2014 to 2016 as the "most important thing of value" that Jafari gave her. (Doc. 171 at 154–56; *see also id.* at 189–90). The 2014 to 2016 period for Jafari's repeated job offers either predated or aligned with the same period that Macrina gave Jafari preferential treatment in the July 2015 selection process for the A&E contract, (Doc. 167 at 110); the September 2015 task order for the Peyton Center design project, (*id.* at 175); and the January 2016 task order for the Rodney Cook Park design project, (*id.* at 198–99). Because the government's case centered on proving that Macrina accepted bribes to give Jafari preferential treatment in the award of city contracts, not that she accepted gratuities without prior agreement to provide preferential treatment, the rejection of Macrina's proposed instruction did not seriously impair her defense. *See United States v. Gaines*, 690 F.2d 849, 857 (11th Cir. 1982)

(affirming rejection of defense instruction "because it was tangential to the case and could have distracted the jury from the central issues").

Second, the pattern instruction delivered by the district court required the jury to find that Macrina acted "corruptly," which meant that evidence had to show she had the intent to "accomplish an unlawful end . . . or to use an unlawful method." (Doc. 171 at 204). The inclusion of "corruptly" in Section 666 "diminished" any concern with "criminalizing legal gratuities . . . not linked to an identifiable act." *McNair*, 605 F.3d at 1191 (quotation marks omitted); *see also id.* at 1188; *Hamilton*, 46 F.4th at 396 (noting that most courts view the "corruptly" language as providing "a limiting principle" and "an intent requirement"). The district court's instruction that the jury needed to find she acted "corruptly" thus enabled Macrina to contest her criminal intent, and Macrina did precisely that. *See Maxwell*, 579 F.3d at 1304 (holding that no serious impairment of defense where the "instructions were sufficient to enable [the defendant] to argue in closing that he lacked the requisite criminal intent").

Third, Macrina cannot show her defense was seriously impaired because, based on the district court's jury instruction, she repeatedly contended in her closing argument that there was no evidence of a bribe when she received benefits only after taking government action.

(Doc. 171 at 164–67, 172, 186). Defense counsel argued that "this case is . . . about did she have criminal intent," and that the definition of "corruptly" was the "critical definition that's going to decide this case." (*Id.* at 172). And counsel argued that benefits given to Macrina did not "really matter[] because the timeline shows you that things were not corruptly exchanged in connection with the A/E contract, which was years prior." (*Id.* at 186). Macrina cannot establish that the rejection of her jury instruction "seriously impaired" her defense when she presented a full-throated closing argument that benefits paid after the contracts at issue were awarded did not evince corrupt intent. *United States v. Martinelli*, 454 F.3d 1300, 1316–17 (11th Cir. 2006) (rejecting serious impairment from denial of good faith instruction when defense counsel argued good faith in closing).

Nothing in the jury charge hindered Macrina from arguing facts consistent with her proposed instruction, which is exactly what she did in closing argument. Accordingly, Macrina cannot establish that the district court abused its discretion in rejecting her legally incorrect instruction, which did not seriously hamstring her defense. *Ndiaye*, 434 F.3d at 1293.

## CONCLUSION

The United States respectfully requests that this Court affirm Macrina's conviction and sentence.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

*/s/Nathan P. Kitchens*
NATHAN P. KITCHENS
*Assistant United States Attorney*

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 word processing software in 14-point Goudy Old Style.

This brief complies with the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word processing software, it contains 12,392 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Today, this brief was uploaded to the Court's website using the CM/ECF system, which automatically sends notification to the parties and counsel of record:

> PAUL S. KISH, ESQ.
> Kish Law LLC
> Suite 2505
> 229 Peachtree St NE
> Atlanta, GA 30303

September 18, 2023

> /s/Nathan P. Kitchens
> _____
> NATHAN P. KITCHENS
> *Assistant United States Attorney*